## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FELIZ RAEL, in her capacity as the
Personal Representative for the
Estate of Robert Lee Carroll, deceased;
CHAMBLEE LABELL GARCES-WIGFALL,
individually and as next friend for her
two minor children: Raheem King Garces,
and Ro'Miyah Lee Carroll; CORETHA
DAVENPORT; BEVERLY CARROLL;
ASHLEY CARROLL; JERRY CARROLL;
ANGELA BLOCK CARROLL, individually
and as next friend for her three minor children
Robyn Carroll, Roby Carroll, and Robert
Carroll IV; and RA'CHELLE CARROLL,

      Plaintiffs,

v.                                  No. 1:22-cv-00703-MIS-JFR

THE McKINLEY COUNTY BOARD OF
COUNTY COMMISSIONERS, a political
subdivision of the State of New Mexico;
McKINLEY COUNTY SHERIFF'S OFFICE;
RONALD SILVERSMITH, McKinley County
Sheriff, individually; DEWAYNE HOLDER,
Individually; SHANE BENNETT, individually;
and TERENCE WILLIE, individually,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION TO DISMISS

**THIS MATTER** is before the Court on "Ronald Silversmith and McKinley County

Sheriff's Office's Motion to Dismiss and for Qualified Immunity" ("Motion") [ECF No. 41], filed

March 13, 2023, by Defendants McKinley County Sheriff's Office and Ronald Silversmith

(collectively "Defendants"). Plaintiffs Feliz Rael, Chamblee Labell Garces-Wigfall, Coretha

Davenport, Beverly Carroll, Ashley Carroll, Jerry Carroll, Angela Block Carroll, and Ra'chelle

Carroll (collectively "Plaintiffs") filed their Response and Supplemental Response, and

Defendants filed their Reply. ECF Nos. 45, 48, 50. Defendants seek dismissal of specific claims in Plaintiffs' First Amended Complaint [ECF No. 40] pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). ECF No. 41 at 1. Upon due consideration of the parties' submissions, the First Amended Complaint, and the relevant law, the Court will **GRANT** the Motion, dismiss without prejudice Count III of Plaintiffs' First Amended Complaint against Defendant Ronald Silversmith, and sua sponte allow Plaintiffs leave to amend their First Amended Complaint within 30 days of entry of this Order.

## FACTUAL BACKGROUND[1]

This case arises out of the death of Robert Lee Carroll during an encounter with McKinley County Sheriff's Office Deputies Dewayne Holder, Shane Bennett, and Terence Willie. ECF No. 40 at 2. Specifically, Mr. Carroll was tased at least 18 times while pressed to the ground by the aforementioned deputies. *Id*. at 20. Mr. Carroll subsequently passed away due to hypertensive cardiovascular disease exacerbated by being physically restrained. *Id*.

On May 18, 2022, a semi-truck driver called the police to report that a man was "acting strange." *Id*. at 5, ¶ 16. The semi-truck driver was parked in a rest area on the west side of Interstate-40, near the Arizona-New Mexico port of entry. *Id.* The strange behavior that the man, Mr. Carroll, allegedly engaging in included repeatedly entering and exiting his vehicle, mumbling to himself, and parking his vehicle on the shoulder of the road, away from traffic. *Id*. at 5, ¶ 17. Defendant Holder responded to the call and made contact with Mr. Carroll. *Id*. at 6, ¶ 18. Mr. Carroll was outside of his vehicle. *Id*. at 6, ¶ 19. He was not acting suspiciously, engaging in any unlawful conduct, or posing a threat to himself, the public, or Defendant Holder. *Id*.

---

[1] The Court accepts the truth of all well-pleaded factual allegations in Plaintiffs' First Amended Complaint and draws all reasonable inferences in Plaintiffs' favor for the purposes of this Motion.

When Defendant Holder arrived, Mr. Carroll was wearing a white tank top and red sweatpants, was unarmed, and was walking in a rest area away from the roadway. *Id*. at 6, ¶ 20. Rather than initiating a tactical plan or strategy to approach Mr. Carroll to ensure the safety of both Defendant Holder and Mr. Carroll, Defendant Holder rushed towards Mr. Carroll, shouting commands and obscenities. *Id*. at 6, ¶ 22. Defendant Holder was aware and had observed that Mr. Carroll was non-aggressive, non-threatening, confused, and disoriented. *Id*. at 6, ¶ 23. Mr. Carroll raised his hands in the air and told Defendant Holder he did not want any problems. *Id*.

Defendant Holder approached Mr. Carroll, which caused Mr. Carroll to state to Defendant Holder that he was trying to leave. *Id*. at 6, ¶ 24. Defendant Holder asked Mr. Carroll where he was trying to go, and Mr. Carroll stated that he was trying to go where he "could mind his fucking business." *Id*. at 6, ¶ 25. Defendant Holder then asked Mr. Carroll if he had been drinking, to which Mr. Carroll said no. *Id*. at 6, ¶ 26.

Defendant Holder then asked Mr. Carroll to approach him because Defendant Holder did not want Mr. Carroll to "be out in the road." *Id*. at 6, ¶ 27. Mr. Carroll, however, was well away from the roadway, standing in the rest area, and posed no threat to his own safety or the safety of Defendant Holder. *Id*. at 6–7, ¶ 27. Defendant Holder continued to tell Mr. Carroll to stay out of the road. *Id*. at 7, ¶ 28. Mr. Carroll told Defendant Holder again that he was just trying to mind his own business. *Id*. at 7, ¶ 29. Defendant Holder asked Mr. Carroll what was going on with him, and Mr. Carroll again stated that he just wanted to leave. *Id*. at 7, ¶ 30.

Defendant Holder then asked Mr. Carroll to move to another location with him, and Mr. Carroll replied, "what happened," indicating that he did not understand why Defendant Holder insisted that Mr. Carroll go with him. *Id*. at 7, ¶ 31. Mr. Carroll then attempted to walk towards his vehicle, and Defendant Holder stated, "No, we're not going back over there." *Id*. at 7, ¶ 32.

Defendant Holder then asked Mr. Carroll to walk over by his patrol unit. *Id*. at 7, ¶ 34. Mr. Carroll complied and started to walk towards Defendant Holder's vehicle, at which time Defendant Holder again told Mr. Carroll to come closer. *Id*. at 7, ¶ 35.

Defendant Holder then reached out for Mr. Carroll's arm and asked Mr. Carroll if he had any weapons on him. *Id*. at 7, ¶ 36. Mr. Carroll said no. *Id*. Mr. Carroll started to back away from Defendant Holder with his hands up and in front of him so that Defendant Holder could see them. *Id*. at 8, ¶ 37. Mr. Carroll was not taking any threatening action and was not engaging in any behavior that risked harm to himself, Defendant Holder, or any other individual. *Id*. Nevertheless, Defendant Holder asked Mr. Carroll to turn around so he could pat Mr. Carroll down. *Id*. at 8, ¶ 38.

With his hands up, Mr. Carroll continued to back away, stating, "I don't want no problems." *Id*. at 8, ¶ 40. Defendant Holder asked Mr. Carroll to move towards Defendant Holder's police unit, but Mr. Carroll walked away. *Id*. at 8, ¶ 41. At this time, Defendant Holder did not indicate to Mr. Carroll that he was under arrest or had done anything unlawful. *Id*. at 8, ¶ 42. Defendant Holder started yelling at Mr. Carroll to get out of the road, but Mr. Carroll was on the shoulder and away from the roadway when Defendant Holder yelled at him. *Id*. at 8, ¶ 43. Mr. Carroll continued walking away with his hands up, saying he did not want any trouble. *Id*. at 8, ¶ 44. Mr. Carroll then continued to walk on the shoulder of the road, and was a safe distance from the roadway, when he looked over his shoulder and said to Defendant Holder, "What is going on?" *Id*. at 8, ¶ 45. Mr. Carroll appeared frightened and then began to jog away on the shoulder and safely from the roadway. *Id*. at 9, ¶ 46. As Mr. Carroll moved away from Defendant Holder, he remained on the shoulder, keeping his hands above his head even as his pants fell to the ground. *Id*. at 9, ¶ 48.

4

Defendant Holder then told Mr. Carroll to "stop right there," and Mr. Carroll complied. *Id*. at 9, ¶ 49. Mr. Carroll kept his hands in the air, turned around, and said, "I don't want nothing to do with it bro." *Id*. at 9, ¶ 50. Defendant Holder then told Mr. Carroll to get down on his knees. *Id*. at 9, ¶ 51. Mr. Carroll turned away, pulled up his pants, kept his hands in the air, and continued to walk away from Defendant Holder. *Id*. at 9, ¶ 52. Defendant Holder yelled at Mr. Carroll to "come here," and Mr. Carroll responded by saying, "What's going on?" *Id*. at 9, ¶ 53.

Defendant Holder again demanded that Mr. Carroll approach him and talk to him. *Id*. at 9, ¶ 55. Mr. Carroll refused and ran away. *Id*. at 9, ¶ 57. Mr. Carroll then crossed Interstate-40 in an attempt to get away from Defendant Holder, during which Defendant Holder continued to pursue him while yelling to get out of the road. *Id*. at 10, ¶ 58. Mr. Carroll then walked over to the grass median between the two sections of the Interstate. *Id*. at 10, ¶ 59. Mr. Carroll posed no danger to himself, Defendant Holder, or any other individual at this time. *Id*.

Nevertheless, Defendant Holder continued his attempts to detain Mr. Carroll. *Id*. at 10, ¶ 60. While standing on the shoulder of the roadway, Defendant Holder told Mr. Carroll to "stop right there." *Id*. at 10, ¶ 61. Mr. Carroll responded by asking, "Why?" *Id*. Mr. Carroll continued to walk away from Defendant Holder, but Defendant Holder pushed Mr. Carroll to the ground. *Id*. at 10, ¶ 62. Mr. Carroll then fell on his back, and the push caused Mr. Carroll to fall on the roadway rather than the shoulder. *Id*. at 10, ¶ 64. Deputy Holder's actions put Mr. Carroll in grave danger of being hit by a vehicle traveling on the Interstate. *Id*.

Rather than help Mr. Carroll to his feet or move him to safety, Defendant Holder threatened to tase Mr. Carroll unless he rolled onto his stomach. *Id*. at 10, ¶ 65. Defendant Holder then dragged Mr. Carroll away from the road, forced Mr. Carroll onto his hands and knees, and told Mr. Carroll to put his hands behind his back. *Id*. at 10, ¶ 67. Defendant Holder then pushed Mr. Carroll onto

his back while continuing to yell at him to roll over on his stomach. *Id*. at 11, ¶ 69. This resulted in Mr. Carroll laying on the side of the road, out of breath, with his pants falling towards his ankles. *Id*.

Instead of assisting Mr. Carroll, Defendant Holder again yelled at Mr. Carroll to roll over. *Id*. at 11, ¶ 70. Mr. Carroll responded: "I'm dying." *Id*. at 11, ¶ 71. Defendant Holder then pushed Mr. Carroll's body over and continued to yell at him to put his hands behind his back. *Id*. at 11, ¶ 72. Mr. Carroll was not resisting Defendant Holder. *Id*. at 11, ¶ 73. Defendant Holder then put one handcuff on Mr. Carroll's right wrist while continuing to yell at him to roll over. *Id*. at 11, ¶ 74. Mr. Carroll attempted to stand up but was unable to. *Id*. at 11, ¶ 75. Rather, Mr. Carroll immediately fell back down to the ground. *Id*.

Mr. Carroll then stood up and attempted to move away from Defendant Holder while his pants and underwear fell to the ground. *Id*. at 11, ¶ 76. However, Mr. Carroll was unable to do so and fell to the ground again. *Id*. Defendant Holder then approached Mr. Carroll while he was lying on the ground. *Id*. at 11, ¶ 77. Mr. Carroll then asked Defendant Holder, "What are you trying to [do]?" *Id*. at 11, ¶ 78. Defendant Holder again threatened to tase Mr. Carroll. *Id*. at 11, ¶ 79. Mr. Carroll responded by asking, "Why?" *Id*. at 11, ¶ 80.

Defendant Holder again told Mr. Carroll to roll over and put his hands behind his back. *Id*. at 12, ¶ 81. Mr. Carroll again asked, "Why?" *Id*. at 12, ¶ 82. At this point, Mr. Carroll was on his back and started pushing away from Defendant Holder with his feet while stating, "I didn't do anything." *Id*. at 12, ¶ 83. Mr. Carroll tried to sit up, but Defendant Holder said, "If you get up, I'm going to fucking tase you dude." *Id*. at 12, ¶ 84.

Mr. Carroll pushed up from the ground onto his knees with one hand bracing his body and the other hand up in the air while Defendant Holder continued to yell for Mr. Carroll to put his

6

hands behind his back. *Id*. at 12, ¶ 85. Mr. Carroll again attempted to stand up. *Id*. at 12, ¶ 86. Defendant Holder then employed his taser on Mr. Carroll. *Id*. at 12, ¶ 87. Defendant Holder then subsequently tased Mr. Carroll at least 17 more times. *Id*. at 12–17, ¶¶ 88–157.

After the third time deploying his taser, Defendant Holder pushed Mr. Carroll to the ground and radioed that he was in the median tasing Mr. Carroll but could not get him under control. *Id*. at 13, ¶ 99. After the eleventh time Defendant Holder tased Mr. Carroll, Defendant Bennett arrived on the scene, approached Mr. Carroll and Defendant Holder, and told Defendant Holder to "tase him again." *Id*. at 16, ¶ 138. After the sixteenth time Defendant Holder tased Mr. Carroll, Defendant Bennett pushed Mr. Carroll onto his stomach and put his knee on Mr. Carroll's back. *Id*. at 17, ¶ 153. This resulted in Defendant Bennett applying the force of his body weight to Mr. Carroll's back while Mr. Carroll was lying on his stomach with his face in the dirt and grass. *Id*.

After the eighteenth time Defendant Holder tased Mr. Carroll, Defendant Willie then arrived on scene and pulled Mr. Carroll's right arm behind his body, causing Mr. Carroll's face to be pressed against the ground. *Id*. at 17, ¶ 161. Defendants Holder, Bennett, and Willie forced Mr. Carroll to lay face down with his mouth and nose in the dirt and grass. *Id*. at 17, ¶ 162. Mr. Carroll remained motionless as the deputies placed him into handcuffs and as other deputies arrived. *Id*. at 18, ¶ 165. Neither Defendants Holder, Bennett, nor Willie checked to see if Mr. Carroll was "okay, breathing, or even alive." *Id*. at 18, ¶ 170. In total, Mr. Carroll lay motionless on the ground, surrounded by Defendants Holder, Bennett, and Willie, for 3 minutes and 1 second before someone asked if Mr. Carroll was alive. *Id*. at 19, ¶ 177.

Defendants Holder, Bennett, and Willie, along with other deputies, rolled Mr. Carroll onto his back, but Mr. Carroll was motionless. *Id*. at 19, ¶ 178. The deputies started CPR, but Mr. Carroll's body was transferred to the hospital. *Id*. at 19, ¶¶ 180, 182. An autopsy determined that

Mr. Carroll's cause of death was hypertensive cardiovascular disease exacerbated by being physically restrained. *Id.* at 20, ¶ 186.

This Motion specifically concerns Defendants McKinley County Sheriff's Office and Ronald Silversmith. Defendant McKinley County Sheriff's Office is a law enforcement agency funded through and overseen by the McKinley County Board of County Commissioners. *Id.* at 3, ¶ 5. Defendant McKinley County Sheriff's Office employed Defendants Holder, Bennett, Willie, and Silversmith. *Id.* Defendant Silversmith, sued in his individual capacity, was the McKinley County Sheriff at all times relevant and material to the allegations in Plaintiffs' First Amended Complaint. *Id.* at 4, ¶ 6. Defendant Silversmith was responsible for supervising and training the officers and employees of the McKinley County Sheriff's Office who participated in the events leading to the tasing and death of Mr. Carroll. *Id.*

Plaintiffs allege that Defendants McKinley County Sheriff's Office and Silversmith had a duty to train and supervise Defendants Holder, Bennett, and Willie to act reasonably and with due regard for the safety of the public, including on how to:

> a) properly interact with the public; b) use appropriate law enforcement techniques to prevent injury and death to members of the public; c) perform safe and effective searches; d) use effective and reasonable tactical plans and strategies to prevent the use of deadly force; e) ensure law enforcement officers respond appropriately to situations involving individuals who are disoriented without resorting to unreasonable and excessive force; and f) utilize de-escalation techniques.

*Id.* at 20, ¶ 187; 37, ¶ 308. Plaintiffs contend that Defendants McKinley County Sheriff's Office and Silversmith breached these duties by failing to adequately train and supervise Defendants Holder, Bennett, and Willie to ensure, among other things, that they:

> a) took command of the scene; b) utilized a tactical plan to provide guidance to other law enforcement officers; c) made certain all law

enforcement officers at the scene and involved in the matter used proper law enforcement techniques to prevent serious injury and harm to members of the public they encountered including Robert Carroll; d) made sure that law enforcement officers utilized de-escalation techniques.

*Id*. at 20, ¶ 188; 37, ¶ 309; 38, ¶ 316. Instead, Plaintiffs allege they gave Defendants Holder, Bennett, and Willie unbridled power to use excessive force without due regard for constitutional rights, including the rights of Mr. Carroll. *Id*. at 37, ¶ 309.

For example, the McKinley County Sheriff's Office Non-Deadly and Low Lethality Use of Force policy requires, "[w]hen the use of force is needed, employees shall assess the incident to determine, based on their training and experience, which options in the use of force continuum shall best de-escalate the situation and bring it under control in a safe and prudent manner." *Id*. at 20–21, ¶ 189. This policy also states that physical force may only be used by deputies to "[p]rotect themselves or others from physical harm," "[r]estrain or subdue a resistant suspect," or "[b]ring an unlawful situation safely and effectively under control." *Id*. at 21, ¶ 191. Additionally, it states that a taser "shall be used only when physical force is deemed necessary and is justified to prevent the possibility of injury to employees, suspects or other persons." *Id*. at 21, ¶ 194. Finally, the policy states that tasers "shall not" be used "[i]n cases of passive resistance unless: 1) [t]he use is reasonable and justified under the circumstances of the incident [; or] 2) [a] lesser means of control or force has been attempted and failed to gain compliance or the ceasing of resistance." *Id*. at 21–22, ¶ 196. Neither Defendants Holder, Bennett, nor Willie followed this policy when interacting with Mr. Carroll. *Id*. at 21–22, ¶¶ 190, 192–93, 195, 197–98.

Moreover, McKinley County Sheriff's Office Standard Operating Procedure 311.09 states that a stop and frisk search can only be conducted by a McKinley County Sheriff's deputy where there is "reason to believe that the person is armed and/or presently dangerous." *Id*. at 22, ¶ 199.

9

And McKinley County Sheriff's Office Standard Operating Procedure 319 states that McKinley County Sheriff's deputies may only use deadly force to: 1) "protect themselves or others from what is reasonably believed to be an **IMMEDIATE THREAT OF DEATH OR SERIOUS BODILY INJURY**;" or to 2) "prevent the escape of a fleeing felon whom the employee has probable cause to believe poses a **SIGNIFICANT THREAT TO HUMAN LIFE** if escape should occur and the justification is **CLEAR** and **IMMEDIATE**." *Id.* at 22, ¶ 202 (emphasis in original). Neither Defendants Holder, Bennett, nor Willie followed these policies when interacting with Mr. Carroll. *Id.* at 22–23, ¶¶ 200, 203.

Lastly, Defendants McKinley County Sheriff's Office and Silversmith allowed McKinley County Sheriff's Deputies to cover up, minimize, or not report instances of force or violations of the law. *Id.* at 23–24, ¶ 208. For example, in February of 2017, McKinley County Sheriff Deputies Richard Rangel, Arnold Noriega, Johnson Lee, Joseph Guillen, and Monty Yazzie were found, following an internal investigation, to have all failed to report an incident at a party where an off-duty McKinley County Sheriff's deputy assaulted an individual to proper law enforcement authorities and their superiors. *Id.* at 24, ¶ 209. That same investigation found that Deputy Rangel lied to his superior and to an internal affairs investigator regarding events related to the assault, including claiming that an injury he sustained during the assault resulted from a dog bite rather than his unlawful attack on another individual. *Id.*

## PROCEDURAL BACKGROUND

Plaintiffs filed their First Amended Complaint asserting the following claims against both Defendants McKinley County Sheriff's Office and Silversmith: a 42 U.S.C. § 1983 claim for violations of the Fourth and Fourteenth Amendments to the United States Constitution based on a failure to train and supervise (Count III); a violation of the New Mexico Tort Claims Act, N.M.

Stat. Ann. § 41-4-12, for assault and battery (Count VIII); a violation of the New Mexico Tort

Claims Act, N.M. Stat. Ann. § 41-4-12, for negligent training and supervision (Count IX); a

violation of the New Mexico Wrongful Death Act, N.M. Stat. Ann. § 41-2-1 (Count X); and a loss

of consortium claim under New Mexico law (Count XI). ECF No. 40 at 30–40. Additionally,

Plaintiffs sued Defendant McKinley County Sheriff's Office separately for a violation of Article

II, Section 10 of the New Mexico Constitution for excessive force (Count VI) and a violation of

the New Mexico Civil Rights Act, N.M. Stat. Ann. § 41-4A-3 (Count VII). *Id.*

On March 13, 2023, Defendants filed the instant Motion seeking dismissal of certain claims

in Plaintiffs' First Amended Complaint pursuant to Rule 12(b)(6). ECF No. 41 at 1. Specifically,

the Motion seeks dismissal of the 42 U.S.C. § 1983 claim (Count III) against Defendant

Silversmith for failure to state a claim and dismissal of all claims against Defendant McKinley

County Sheriff's Office as it is a non-suable entity. *Id.* at 1–2. Plaintiffs filed their Response on

April 3, 2023 and Supplemental Response on April 19, 2023, and Defendants filed their Reply on

May 3, 2023. ECF Nos. 45, 48, 50.

## LEGAL STANDARD

Pursuant to Rule 12(b)(6), a party may move for dismissal if the complaint fails "to state a

claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6)

motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not impose a probability

requirement but demands "more than a sheer possibility that a defendant has acted unlawfully."

*Id.* Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action"

will not suffice. *Twombly*, 550 U.S. at 555. Although the court must accept the truth of all properly

alleged facts and draw all reasonable inferences in the plaintiffs' favor, the plaintiff still "must nudge the claim across the line from conceivable or speculative to plausible." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

## DISCUSSION

### I.   The First Amended Complaint does not allege a plausible supervisory liability claim against Defendant Silversmith.

Plaintiffs' individual-capacity Section 1983 claim against Defendant Silversmith is predicated on a supervisory-liability theory. It is undisputed that Defendant Silversmith had no personal contact with Mr. Carroll or direct and contemporaneous knowledge of Mr. Carroll's interactions with McKinley County Sheriff's Office deputies on the date of incident. Rather, Plaintiffs allege Defendant Silversmith failed to train and supervise Defendants Holder, Bennett, and Willie. ECF No. 40 at 30–32.

Defendant Silversmith argues Plaintiffs' First Amended Complaint fails to plausibly allege a supervisory liability claim based on a violation of the Fourth and Fourteenth Amendments to the United States Constitution. ECF No. 41 at 11. Specifically, Defendant Silversmith contends that the allegations made against him are formulaic recitations and are not factual allegations regarding what he purportedly knew, how he failed to train, what he failed to train on, and how any particular failure caused a constitutional violation to Mr. Carroll. *Id*. Instead, "[t]he commonsense reading of the allegations against [Defendant] Silversmith are simply that he was the sheriff." *Id*.

Plaintiffs rebut these contentions and maintain that they have met the burden to show that Defendant Silversmith at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers. ECF No. 45 at 3–4.

12

### A.  Applicable Law

Supervisor status alone is insufficient to hold a defendant individually liable in a Section 1983 suit, particularly as a government official cannot be held responsible for the actions of subordinates based merely on a theory of vicarious liability or respondeat superior. *See Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Rather, the plaintiff must demonstrate that "an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, [their] exercise of control or direction, or [their] failure to supervise." *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000) (quoting *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988)). The focus is on what the supervisor did or caused to be done, "the resulting injury attributable to [their] conduct, and the *mens rea* required of [them] to be held liable, which can be no less than the *mens rea* required of anyone else. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010). "Simply put, there's no special rule of liability for supervisors. The test for them is the same as the test for everyone else." *Id.* A plaintiff must plead "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

To do so, a plaintiff must plausibly allege that: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). The Tenth Circuit has also phrased these requirements as "(1) personal involvement; (2) sufficient causal connection, and (3) culpable state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (quoting *Dodds*, 614 F.3d at 1195).

### 1. Personal Involvement

Personal involvement is established where a supervisor "creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution." *Brown v. Montoya*, 662 F.3d 1152, 1163–64 (10th Cir. 2011) (quoting *Dodds*, 614 F.3d at 1199). A failure to train or supervise subordinates may constitute such a policy. *See, e.g.*, *Mahdi v. Salt Lake Police Dep't*, 54 F.4th 1232, 1240 (10th Cir. 2022). However, mere knowledge and acquiescence in their subordinates' misconduct is insufficient. *Iqbal*, 556 U.S. at 677.

To establish a failure to train claim, a plaintiff must show "essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Keith v. Koerner*, 843 F.3d 833, 838 (10th Cir. 2016) (quoting *Houston v. Reich*, 932 F.2d 883, 888 (10th Cir. 1991)). It is not enough to allege "general deficiencies" in a particular training program. *Id*. (citing *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999)). Rather, a plaintiff "must identify a specific deficiency in the [entity's] training program closely related to [their] ultimate injury" and show a direct causal connection between the deficiency in training and the violation of their constitutional rights. *Id*. (quoting *Lopez*, 172 F.3d at 760).

### 2. Causation

The second element of the "affirmative link" between a supervisor and an alleged constitutional deprivation requires proof of causation. *Id*. at 837. "A plaintiff [must] establish the 'requisite causal connection' by showing 'the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [their] constitutional rights.'" *Schneider*, 717 F.3d at 768 (quoting *Dodds*, 614 F.3d at 1185).

14

### 3.   State of mind

Lastly, Section 1983 has no state-of-mind requirement other than that necessary to establish a violation of the underlying constitutional right. *Daniels v. Williams*, 474 U.S. 327, 328 (1986). After *Iqbal*, a plaintiff "can no longer succeed on a § 1983 claim against [a] [d]efendant by showing that as a supervisor [they] behaved 'knowingly or with "deliberate indifference" that a constitutional violation would occur' at the hands of [their] subordinates, unless that is the same state of mind required for the constitutional deprivation [the plaintiff] alleges." *Dodds*, 614 F.3d at 1204 (quoting *Serna v. Colorado Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006)). Thus, the state of mind of the supervisor "'can be no less than the *mens rea* required' of [any of their] subordinates to commit the underlying constitutional violation." *Est. of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quoting *Porro*, 624 F.3d at 1328).

### B.   Analysis

The Court must determine whether Plaintiffs properly allege a supervisory liability claim against Defendant Silversmith. The Court first addresses Plaintiffs' failure to train theory of liability. Plaintiffs allege that Defendant Silversmith was responsible for training officers and employees of the McKinley County Sheriff's Office, including Defendants Holder, Bennett, and Willie. ECF No. 40 at 4, ¶ 60. Plaintiffs assert that Defendant Silversmith had a duty to train Defendants Holder, Bennett, and Willie to act reasonably and with due regard for the safety of the public, including on how to:

> a) properly interact with the public; b) use appropriate law enforcement techniques to prevent injury and death to members of the public; c) perform safe and effective searches; d) use effective and reasonable tactical plans and strategies to prevent the use of deadly force; e) ensure law enforcement officers respond appropriately to situations involving individuals who are disoriented

> without resorting to unreasonable and excessive force; and f) utilize
> de-escalation techniques.

*Id*. at 20, ¶ 187; 37, ¶ 308.

Further, Plaintiffs contend that Defendant Silversmith breached his duty to train by failing

to adequately train Defendants Holder, Bennett, and Willie to ensure that they:

> a) took command of the scene; b) utilized a tactical plan to provide
> guidance to other law enforcement officers; c) made certain all law
> enforcement officers at the scene and involved in the matter used
> proper law enforcement techniques to prevent serious injury and
> harm to members of the public they encountered including Robert
> Carroll; d) made sure that law enforcement officers utilized de-
> escalation techniques.

*Id*. at 20, ¶ 188; 37, ¶ 309; 38, ¶ 316.

Additionally, as evidence of Defendant Silversmith's failure to train, Plaintiffs point to

several formal policies that Defendants Holder, Bennett, and Willie failed to follow, including

McKinley County Sheriff's Office Non-Deadly and Low Lethality Use of Force policy and

McKinley County Sheriff's Office Standard Operating Procedure 311.09 and 319. *Id*. at 20–23.

With respect to the first element—Defendant Silversmith's personal involvement—

Plaintiffs fail to allege with particularity any specific deficiencies in the McKinley County

Sheriff's Office's training program that are closely related to their ultimate injury. As an initial

matter, it is entirely unclear from the First Amended Complaint what specific relevant training, *if*

*any*, Defendants Holder, Bennett, and Willie received. To assess the adequacy of Plaintiffs' failure

to train claim, it is necessary to establish whether the deputies received any training on the subject

areas Plaintiffs contend they were not properly trained on, such as how to take command of a

scene, etc. *See, e.g., id*. at 20, ¶¶ 187–88; 37, ¶¶ 308–09, 316. If such training was provided,

Plaintiffs must identify *specific* flaws with those trainings that would cause a Fourth or Fourteenth

Amendment violation. Alternatively, if the deputies were never trained on the specific subject areas Plaintiffs contend they should have been properly trained on, Plaintiffs must then explain how a lack of training on these subjects would lead to a Fourth or Fourteenth Amendment violation. For instance, an obvious example of a supervisor failing to train their subordinates would be if a sheriff equipped deputies with lethal weapons for unrestricted use on the public without providing any guidance on how or when to use such weapons appropriately. Plaintiffs' First Amended Complaint makes no analogous allegation.

Furthermore, evidence that Defendants Holder, Bennett, and Willie failed to follow specific written policies does not necessarily imply that Defendant Silversmith failed to train them on said policies. In sum, without additional details on what relevant subject areas Defendants Holder, Bennett, and Willie were or were not trained on, Plaintiffs fall short of alleging a plausible failure to train claim against Defendant Silversmith.

Plaintiffs' failure to supervise theory fails for similar reasons, as they likewise fail to allege personal involvement by Defendant Silversmith. Plaintiffs allege that Defendant Silversmith was responsible for supervising officers and employees of the McKinley County Sheriff's Office, including Defendants Holder, Bennett, and Willie. *Id*. at 4, ¶ 60. Plaintiffs then contend Defendant Silversmith allowed McKinley County Sheriff's Deputies to cover up, minimize, or not report instances of force or violations of the law. *Id*. at 23–24, ¶ 208. To support this claim, Plaintiffs highlight an incident from February 2017 in which deputies not involved in the underlying incident with Mr. Carroll were discovered to have neglected to report an off-duty McKinley County Sheriff's deputy for assaulting an individual at a party to appropriate law enforcement authorities and their superiors. *Id*. at 24, ¶ 209. Additionally, during the investigation of this incident, it was

revealed that one of the deputies provided false information to their superior and an internal affairs investigator concerning the events related to the assault. *Id.*

First and foremost, the example provided by Plaintiffs to support the claim that Defendant Silversmith failed to supervise Defendants Holder, Bennett, and Willie does not proport to involve any of them. Moreover, even if it did, it appears that in the example provided, a deputy lied to their superior, which does not directly implicate any wrongdoing on the part of the superior. The sole allegation in Plaintiffs' First Amended Complaint—stating that Defendant Silversmith was responsible for supervising Defendants Holder, Bennett, and Willie, and therefore should be held liable for their actions—is insufficient to establish anything beyond a theory of respondeat superior liability. Plaintiffs have not asserted, for example, that Defendant Silversmith was aware of repeated misconduct by Defendants Holder, Bennett, or Willie, yet failed to take appropriate disciplinary action or provide additional training to address such issues and, further, that such failure would lead to a Fourth or Fourteenth Amendment violation. As such, Plaintiffs fail to adequately allege that Defendant Silversmith failed to supervise Defendants Holder, Bennett, and Willie.

In conclusion, Plaintiffs fails to allege a plausible supervisory liability claim against Defendant Silversmith.

### C.  Leave to Amend

Plaintiffs are represented by counsel but have not requested, through motion or otherwise, leave to amend their First Amended Complaint. "In dismissing a complaint for failure to state a claim, the court should grant leave to amend freely 'if it appears at all possible that the plaintiff can correct the defect.'" *Triplett v. LeFlore Cty., Okla.*, 712 F.2d 444, 446 (10th Cir. 1983) (quoting 3 Moore's Federal Practice, ¶ 15.10 & n. 2 (1983)). However, "outside of the pro se

context, when a litigant fails to put the district court on adequate notice—in a legally cognizable manner—of [their] request for leave to amend, then the district court will not be faulted for failing to grant leave to amend." *Doe v. Heil*, 533 F. App'x 831, 847 (10th Cir. 2013). Therefore, it would be within the Court's discretion to decline to grant leave to amend sua sponte. *See, e.g.*, *Sullivan v. DaVita Healthcare Partners, Inc.*, 780 F. App'x 612, 616 (10th Cir. 2019); *Doe*, 533 F. App'x at 847 ("[W]e will not upset the district court's dismissal with prejudice on the grounds that it failed sua sponte to give [plaintiff]—who was represented by counsel—an opportunity to file an amended complaint."). However, the Court—at this juncture—does not find that permitting amendment would prove futile. Therefore, the Court will dismiss Count III of Plaintiffs' First Amended Complaint against Defendant Silversmith with leave to file, if Plaintiffs so choose, a Second Amended Complaint no later than 30 days from the issuance of this Order.

## II.    The McKinley County Sheriff's Office Is a Non-Suable Entity.

Next, Defendant McKinley County Sheriff's Office argues that it cannot be named as a defendant in this lawsuit according to New Mexico law. ECF No. 41 at 13–14. Specifically, Defendant McKinley County Sheriff's Office maintains that New Mexico Statutes Annotated § 4-46-1 precludes claims against a county department such as a sheriff's office. *Id.* Plaintiffs refute this argument and contend that Defendant McKinley County Sheriff's Office is an entity that can be sued, including under the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-12, and New Mexico Civil Rights Act, N.M. Stat. Ann. § 41-4A-3. ECF No. 45 at 5–8.

Rule 17(b)(3) provides that for all parties, other than individuals and corporations, the capacity to be sued is determined by the law of the state where the court is located. Under New Mexico law, a country sheriff's office is not a local governmental entity distinct from the county itself. *See, e.g.*, N.M. Stat. Ann. § 4-38-1 (county constitutes "body politic and corporate").

Further, New Mexico's "naming statute" specifies that when a county is involved in a lawsuit, it should be sued or sue under the name of the board of county commissioners of that specific county. N.M. Stat. Ann. § 4-46-1 ("In all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be the board of county commissioners of the county of . . . . . . . . . ."). There is no indication that either the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-12, or New Mexico Civil Rights Act, N.M. Stat. Ann. § 41-4A-3, intends to abrogate New Mexico's "naming statute." As such, New Mexico law requires a plaintiff to bring suit against a county sheriff's office by naming the appropriate board of county commissioners and not the sheriff's office itself. *See, e.g., Saiz v. Bd. of Cnty. Commissioners of Dona Ana*, No. 22-cv-814 GBW/KRS, 2023 WL 3055610, at *5 (D.N.M. Apr. 24, 2023); *Lamendola v. Taos Cnty. Sheriff's Off.*, 338 F. Supp. 3d 1244, 1251 (D.N.M. 2018); *Angel v. Torrance Cnty. Sheriff's Dep't*, No. CIV 04-195 BB/WPL, 2005 WL 8163621, at *4 (D.N.M. Aug. 23, 2005); *Sanchez v. Torrance Cnty. Sheriff's Dep't*, No. 1:22-cv-00394-WJ, 2022 WL 16528411, at *4 (D.N.M. Oct. 28, 2022). The Court notes that Plaintiffs have already named the McKinley County Board of County Commissioners as a defendant in this action.

Accordingly, the Court dismisses all claims against Defendant McKinley County Sheriff's Office as it is a non-suable entity and finds all claims against Defendant McKinley County Sheriff's Office are deemed to have been brought against Defendant McKinley County Board of County Commissioners.

## CONCLUSION

For the foregoing reasons, "Ronald Silversmith and McKinley County Sheriff's Office's Motion to Dismiss and for Qualified Immunity" [ECF No. 41] is hereby **GRANTED** as follows:

1. It is **HEREBY ORDERED** that Count III of Plaintiffs' First Amended Complaint against Defendant Silversmith is **DISMISSED WITHOUT PREJUDICE**.

2. IT IS **FURTHER ORDERED** that Plaintiffs shall have **30 DAYS** from the date of this Order to file a Second Amended Complaint. If Plaintiffs fail to file a Second Amended Complaint within 30 days, Count III of Plaintiffs' First Amended Complaint against Defendant Silversmith shall be dismissed with prejudice.

3. It is **FURTHER ORDERED** that all claims against Defendant McKinley County Sheriff's Office are **DISMISSED WITH PREJUDICE**.

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE