## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FELIZ RAEL,[1] in her capacity as
the Personal Representative for the
Estate of Robert Lee Carroll, et al.,

     Plaintiffs,

v.

                                   Case 1:22-cv-00703-MIS-JFR

THE McKINLEY COUNTY BOARD
OF COUNTY COMMISSIONERS, et al.,

     Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS HOLDER, BENNETT, AND WILLIE'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS ON THE BASIS OF QUALIFIED IMMUNITY

     **THIS MATTER** is before the Court on Defendants Dwayne Holder, Shane Bennett, and Terence Willie's Motion for Partial Judgment on the Pleadings on the Basis of Qualified Immunity, ECF No. 81, filed September 18, 2023. Plaintiffs filed a Response on October 18, 2023, ECF No. 88, to which Defendants filed a Reply on November 22, 2023, ECF No. 98. Upon review of the Parties' submissions, the record, and the relevant law, the Court will **GRANT IN PART AND DENY IN PART** the Motion.

---

[1] On January 4, 2023, U.S. Magistrate Judge John F. Robbenhaar issued an order substituting Feliz Rael in place of Chamblee Garces-Wigfall as the Personal Representative of the Estate of Robert Lee Carroll. ECF No. 30.

## I.      Background

### A.  Factual background[2]

On May 18, 2022, a semi-truck driver parked in a rest area on the west side of Interstate-40, near the Arizona-New Mexico port of entry, called the police to report that a man—later identified as decedent Robert Lee Carroll—was "acting strange."  Am. Compl., ECF No. 40 ¶ 16.  The strange behavior that Mr. Carroll was allegedly engaging in was entering and exiting his own vehicle, mumbling to himself, and parking his vehicle on the shoulder of the road and away from traffic.  Id. ¶ 17.

Defendant Dewayne Holder of the McKinley County Sheriff's Office ("Deputy Holder") responded to the call and made contact with Mr. Carroll.  Id. ¶ 18.  When Deputy Holder arrived, Mr. Carroll was walking in a rest area, away from the roadway, was wearing a white tank top and red sweatpants, and was unarmed.  Id. ¶ 20.  Deputy Holder rushed towards Mr. Carroll shouting commands and obscenities.  Id. ¶ 21.  Deputy Holder observed that Mr. Carroll was non-aggressive, non-threatening, confused, and disoriented.  Id. ¶ 23.  Mr. Carroll raised his hands in the air and told Deputy Holder he did not want any problems.  Id.  When Deputy Holder approached Mr. Carroll, Mr. Carroll told Deputy Holder that he was trying to leave.  Id. ¶ 24.  Deputy Holder asked Mr. Carroll where he was trying to go, and Mr. Carroll stated that he was trying to go where he "could mind his fucking business."  Id. ¶ 25.   Deputy Holder asked Mr. Carroll if he had been drinking, to which Mr. Carroll replied, "No."  Id. ¶ 26.

Deputy Holder told Mr. Carroll to stay out of the road even though Mr. Carroll was not standing in the roadway, was in the rest area, and posed no threat or danger to his own safety or to

---

[2]          The Court accepts the truth of all well-pleaded factual allegations in Plaintiffs' Amended Complaint and draws all reasonable inferences in Plaintiffs' favor for the purposes of Defendants' Motion.

the safety of Deputy Holder.  Id. ¶ 28.  Mr. Carroll then repeated that he was just trying to mind his own business.  Id. ¶ 29.  Deputy Holder asked Mr. Carroll what was going on with him, and Mr. Carroll repeated that he just wanted to leave.  Id. ¶ 30.  Deputy Holder asked Mr. Carroll to move to another location with him.  Id. ¶ 31.  Mr. Carroll then attempted to walk towards his vehicle, and Deputy Holder said "no, we're not going back over there."  Id. ¶ 32.

Deputy Holder then asked Mr. Carroll to walk over to his patrol unit.  Id. ¶ 34.  Mr. Carroll complied, and started to walk toward Deputy Holder's vehicle, at which time Deputy Holder told Mr. Carroll to come closer.  Id. ¶ 35.  Deputy Holder then reached out for Mr. Carroll's arm and asked Mr. Carroll if he had any weapons on him; Mr. Carroll said "no."  Id. ¶ 36.

Mr. Carroll started to back away from Deputy Holder with his hands up and in front of him so that Defendant Holder could see his hands.  Id. ¶ 37.  Deputy Holder asked Mr. Carroll to turn around so he could pat Mr. Carroll down.  Id. ¶ 38.  Mr. Carroll continued to back away, with his hands up, and said "I don't want no problems."  Id. ¶ 40.  Deputy Holder asked Mr. Carroll to move towards his police unit, but Mr. Carroll walked away.  Id. ¶ 41.  Deputy Holder started yelling at Mr. Carroll to get out of the road, but Mr. Carroll was on the shoulder and away from the roadway when Deputy Holder yelled at him.  Id. ¶ 43.  Mr. Carroll continued to walk away with his hands up, saying that he did not want any trouble.  Id. ¶ 44.  Mr. Carroll then began to jog away, remaining on the shoulder, keeping his hands above his head even as his pants were falling to the ground.  Id. ¶¶ 46, 48.

Deputy Holder then told Mr. Carroll to "stop right there," and Mr. Carroll complied.  Id. ¶ 49.  Mr. Carroll kept his hands in the air, turned around, and said "I don't want nothing to do with it bro."  Id. ¶ 50.  Deputy Holder then told Mr. Carroll to get down on his knees.  Id. ¶ 51.  Mr. Carroll turned away, pulled up his pants, kept his hands in the air, and continued to walk away

from Deputy Holder.  Id. ¶ 52.  Deputy Holder demanded that Mr. Carroll return and talk to him,

id. ¶¶ 53, 55, but Mr. Carroll refused and ran away, id. ¶ 57.

Mr. Carroll then crossed Interstate 40 in an attempt to get away from Deputy Holder.  Id.

¶ 58.  Deputy Holder continued to pursue him while yelling to get out of the road.  Id.  Mr. Carroll

then walked over to the grass median between the two sections of the Interstate.  Id. ¶ 59.  While

standing in the shoulder of the roadway, Deputy Holder told Mr. Carroll to "stop right there."  Id.

¶ 61.  Mr. Carroll responded by asking "why?"  Id.  Mr. Carroll continued to walk away from

Deputy Holder, but Deputy Holder pushed Mr. Carroll to the ground.  Id. ¶ 62.  Mr. Carroll fell on

his back on the roadway.  Id. ¶ 64.  Deputy Holder threatened to tase Mr. Carroll unless he rolled

onto his stomach.  Id. ¶ 65.

Deputy Holder then dragged Mr. Carroll away from the road, forced Mr. Carroll on to his

hands and knees, and told Mr. Carroll to put his hands behind his back.  Id. ¶ 67.  Deputy Holder

then pushed Mr. Carroll onto his back while continuing to yell at Mr. Carroll to roll over on his

stomach.  Id. ¶ 69. This resulted in Mr. Carroll laying on the side of the road, out of breath, with

his pants falling down towards his ankles.  Id.  Deputy Holder yelled at Mr. Carroll to roll over.

Id. ¶ 70.  Mr. Carroll responded: "I'm dying."  Id. ¶ 71.  Deputy Holder then pushed Mr. Carroll's

body over and continued to yell at him to put his hands behind his back.  Id. ¶ 72.  Deputy Holder

then put one handcuff on Mr. Carroll's right wrist while continuing to yell at him to roll over.  Id.

¶ 74.  Mr. Carroll attempted to stand up twice, but fell back down to the ground.  Id. ¶¶ 75-76.

Deputy Holder then approached Mr. Carroll while he was lying on the ground and

threatened to tase him.  Id. ¶¶ 77, 79.  Deputy Holder again told Mr. Carroll to roll over and put

his hands behind his back.  Id. ¶ 81.  Mr. Carroll began pushing away from Deputy Holder with

his feet while saying: "I didn't do anything."  Id. ¶ 83.  When Mr. Carroll tried to sit up, Deputy Holder said "if you get up, I'm going to fucking tase you dude."  Id. ¶ 84.

Mr. Carroll attempted to stand up, and Deputy Holder "employed his taser on Mr. Carroll." Id. ¶ 87.  Mr. Carroll fell to the ground and "exclaimed in pain."  Id. ¶ 88.  Mr. Carroll landed on his back, and Deputy Holder "sent a second stream of electricity into Mr. Carroll's body."  Id. ¶ 89.  Mr. Carroll again attempted to sit up, and Defendant Holder applied his taser to Mr. Carroll's right shoulder, causing him to gasp and fall back to the ground.  Id. ¶ 91.

While Mr. Carroll was lying on his back, Deputy Holder ordered him to put his hands behind his back.  Id. ¶ 93.  Mr. Carroll responded: "I got it."  Id. ¶ 94.  Deputy Holder yelled: "I'm going to give it to you again," and tased Mr. Carroll for a fourth time."  Id. ¶ 97.

Mr. Carroll again attempted to sit up and said to Deputy Holder "why are you crazy?"  Id. ¶ 98.  Defendant Holder pushed Mr. Carroll to the ground, and radioed that he was in the median, tasing Mr. Carroll but could not get him under control.  Id. ¶ 99.

Mr. Carroll again tried to sit up and Deputy Holder tased Mr. Carroll for the fifth time.  Id. ¶¶ 101-02.  The taser caused Mr. Carroll to fall down and roll over on the ground.  Id. ¶ 103.  He ended up laying on his back with his pants at his knees and his underwear falling off.  Id. ¶ 104.  When he reached down to pull up his pants, Deputy Holder ordered him to put his hands behind his back.  Id. ¶¶ 106-07.

At that point, Mr. Carroll appeared to be semi-conscious as he laid on the ground and repeated the word "Lord" several times.  Id. ¶¶ 108-09.  Nevertheless, Deputy Holder tased Mr. Carroll for the sixth time.  Id. ¶¶ 110-11.  Mr. Carroll ended up on his back.  Id. ¶ 112.

When Mr. Carroll rolled over onto his stomach, Deputy Holder immediately tased Mr. Carroll (for the seventh time) on his back, causing him to turn over onto his back once again.  Id.

¶ 113.  Mr. Carroll continued to lay on the ground while Defendant Holder yelled at him to put his hands behind his back.  Id. ¶ 115.  Mr. Carroll did not try to stand up or flee, but shook his head no.  Id. ¶ 116.

Mr. Carroll moved onto his side, laying still for approximately ten seconds before Deputy Holder again ordered him to put his hands behind his back.  Id. ¶ 119.  Mr. Carroll then moved to his hands and knees, and Deputy Holder tased Mr. Carroll (for the eighth time) in the shoulder, causing him to fall onto his back.  Id. ¶ 120.

Deputy Holder grabbed the handcuff on Mr. Carroll's right wrist and demanded that Mr. Carroll put his other hand behind his back.  Id. ¶ 124.  Mr. Carroll moved onto his side so that he could roll onto his stomach, but Defendant Holder again tased Mr. Carroll (for the ninth time), causing Mr. Carroll to again fall onto his back.  Id. ¶ 125.  Mr. Carroll continued trying to roll onto his stomach, but Defendant Holder continued to tase him.  Id. ¶ 128.

Mr. Carroll eventually rolled onto his stomach, at which point Deputy Holder again tased Mr. Carroll (for the tenth time), this time on Mr. Carroll's back between his shoulder blades.  Id. ¶ 129.  Mr. Carroll ended up on his back and was not moving, but Deputy Holder deployed his taser (for the eleventh time) on Mr. Carroll.  Id. ¶¶ 133-34.

While Mr. Carroll laid motionless on his back, Deputy Holder stood up and told Mr. Carroll to roll over.  Id. ¶¶ 136-37.  Mr. Carroll rolled onto his side while trying to get to his stomach.  Id. ¶ 137.  At this point, with Mr. Carroll on his side, not talking or moving, Defendant Shane Bennett ("Deputy Bennett") arrived on the scene, approached Mr. Carroll and Deputy Holder, and told Deputy Holder to "tase him again."  Id. ¶ 138.  Deputy Holder deployed his taser again (for the twelfth time), this time on Mr. Carroll's right wrist because he was still holding the handcuff that was secured to Mr. Carroll's right wrist.  Id. ¶ 139.

Deputy Bennett continued to yell at Mr. Carroll to roll over onto his stomach, which Mr. Carroll attempted to do.  Id. ¶ 141.  While he was attempting to roll over, Deputy holder tased Mr. Carroll two more times (the thirteenth and fourteenth).  Id. ¶¶ 142-43.  Mr. Carroll ended up on his stomach with his pants and underwear at his knees.  Id. ¶ 144.  Although Mr. Carroll was complying with the Deputies' commands and lying on his stomach, Deputy Holder tased Mr. Carroll again (for the fifteenth time), placing his taser by Mr. Carroll's right shoulder blade.  Id. ¶¶ 145, 147.  The fifteenth tasing caused Mr. Carroll to moan in pain and roll over once again, at which point Deputy Holder tased Mr. Carroll (for the sixteenth time) on his left arm.  Id. ¶ 148.

Mr. Carroll rolled onto his side; Deputy Bennett put his knee on Mr. Carroll's hip while applying handcuffs to Mr. Carroll's left wrist.  Id. ¶ 150.  Deputy Bennett continued to order Mr. Carroll to roll onto his stomach, and Mr. Carroll screamed out in pain.  Id. ¶¶ 151-52.  Deputy Bennett then pushed Mr. Carroll onto his stomach and put his knee on Mr. Carroll's back.  Id. ¶ 153.  This resulted in Deputy Bennett applying the force of his body weight to Mr. Carroll's back while Mr. Carroll was laying on his stomach with his face in the dirt and grass.  Id.  Deputy Holder, who was still holding Mr. Carroll's right wrist, tased Mr. Carroll (for the seventeenth time) in the back.  Id. ¶ 154.  While Deputy Bennett was applying the handcuffs to Mr. Carroll's left wrist, Deputy Holder tased Mr. Carroll (for the eighteenth time) on his left shoulder.  Id. ¶ 156.

At this point, Mr. Carroll—who moaned in pain while being tased and handcuffed—was either unconscious or semi-conscious.  Id. ¶¶ 158-59.  However, Deputy Bennett continued to yell at Mr. Carroll not to move while Deputy Holder placed a new handcuff on Mr. Carroll's right wrist.  Id. ¶ 160.

Deputy Willie then arrived and pulled Mr. Carroll's right arm behind his body, causing his face to be pressed against the ground.  Id. ¶ 161.  Mr. Carroll lay face down, with his mouth in the

dirt and grass.  Id. ¶ 162.  Mr. Carroll remained motionless as the deputies placed him into handcuffs while continuing to apply force to Mr. Carroll's back.  Id. ¶¶ 165-67.

After Mr. Carroll was in handcuffs, Deputies Holder, Bennett, and Willie knelt and stood around his motionless body.  Id. ¶ 168.  Mr. Carroll's pants and underwear were at his knees, and his face and mouth were still in the ground.  Id. ¶ 169.  None of the deputies checked to see if Mr. Carroll was breathing.  Id. ¶ 170.

One minute and thirty-six seconds after Mr. Carroll stopped moving, one of the deputies ordered Mr. Carroll to move to his side.  Id. ¶ 175.  Mr. Carroll did not move, but the deputies continued talking for another twenty-five seconds before one of them questioned whether Mr. Carroll was "alright."  Id. ¶ 176.  In total, Mr. Carroll's body was motionless for over three minutes before someone questioned whether he was alive.  Id. ¶ 177.

The deputies rolled Mr. Carroll onto his back and discovered he was not breathing.  Id. ¶¶ 178-79.  They then performed CPR, but Mr. Carroll had died.  Id. ¶¶ 180-81.

An autopsy determined that Mr. Carroll's manner of death was homicide, id. ¶ 185, and that his cause of death was hypertensive cardiovascular disease exacerbated by being physical restrained, id. ¶ 186.

### B.  Relevant procedural background

On March 1, 2023, Plaintiffs[3] filed the operative First Amended Complaint ("Amended Complaint") against the McKinley County Board of County Commissioners; the McKinley

---

[3]     Plaintiffs consist of the following individuals: (1) Feliz Rael, in her capacity as the Personal Representative of the Estate of Robert Lee Carroll; (2) Chamblee Labell Garces-Wigfall, individually and as next friend of the two minor children she shares with Robert Lee Carroll, Raheem King Garces and Ro'Miyah Lee Carroll; (3) Coretha Davenport, Robert Lee Carroll's sister; (4) Beverly Carroll, Robert Lee Carroll's mother; (5) Jerry Carroll, Robert Lee Carroll's brother; (6) Angela Block Carroll, Robert Lee Carroll's widow, individually and on behalf of the three minor children she shares with Robert Lee Carroll, Robyn Carroll, Roby Carroll, and Robert Carroll IV; and (7) Ra'Chelle Carroll, Robert Lee Carroll's adult daughter.

County Sheriff's Office; Ronald Silversmith, the former Sheriff of McKinley County, individually; and Dewayne Holder, Shane Bennett, and Terence Willie, McKinley County Sheriff's Deputies, individually. ECF No. 40. The Amended Complaint alleges the following causes of action under federal law:

- Count I: "Unlawful Arrest in Violation of the Fourth and Fourteenth Amendments Against Defendants Holder, Bennett, and Willie According to 42 U.S.C. § 1983[,]" id. ¶¶ 235-45;

- Count II: "Excessive Use of Force in Violation of the Fourth and Fourteenth Amendments Against Defendants Holder, Bennett, and Willie According to 42 U.S.C. § 1983[,]" id. ¶¶ 246-60;

- Count III: "Supervisory and County Liability According to 42 U.S.C. § 1983 Against Defendants Board of County Commissioners, Sheriff's Office, and Silversmith[,]" id. ¶¶ 261-74;

- Count IV: "Assault and Battery Resulting in Wrongful Death According to 42 U.S.C. § 1983 Against Defendants Holder, Bennett, and Willie[,]" id. ¶¶ 275-78;

- Count V: "Survival Action – Violation of Plaintiffs' Chamblee Labell Garces-Wigfall on behalf of her minor children, Coretha Davenport, Beverly Carroll, Ashley Carroll, and Jerry Carroll's Civil Rights to Familial Relationship According to 42 U.S.C. § 1983[,]" id. ¶¶ 279-80[.]

The Amended Complaint also contains six causes of action under New Mexico law, including:

- Count VI: "Violation of N.M. Const. Art. II, Section 10 (Excessive Force) By Plaintiff Estate of Robert Carroll Against McKinley County Board of County Commissioners and McKinley County Sheriff's Office[,]" id. ¶¶ 281-88;

- <u>Count VII</u>: "Violation of N.M. Const. Art. II, Section 18 (Deprivation of Life without Due Process) By Plaintiff Estate of Robert Carroll Against McKinley County Board of County Commissioners and McKinley County Sheriff's Office[,]" <u>id.</u> ¶¶ 289-94;

- <u>Count VIII</u>: "Violation of the New Mexico Tort Claims Act Brought by The Estate of Robert Carroll Against All Defendants for Assault and Battery as Prohibited by NMSA 1978, § 41-4-12[,]" <u>id.</u> ¶¶ 295-04;

- <u>Count IX</u>: "Violation of the New Mexico Tort Claims Act Brought by the Estate of Robert Carroll Against Defendants McKinley County Board of County Commissioners, McKinley County Sheriff's Office, and Ron Silversmith for Negligent Training and Supervision NMSA 1978, § 41-4-12[,]" <u>id.</u> ¶¶ 305-10;

- <u>Count X</u>: "Wrongful Death Brought By the Estate of Robert Carroll Against All Defendants NMSA 1978, § 41-2-1 <u>et seq.</u>[,]" <u>id.</u> ¶¶ 311-18; and

- <u>Count XI</u>: "Loss of Consortium Against All Defendants By Plaintiffs Angela Block Carroll, individually and on behalf of her minor children, and Ra'Chelle Carroll[,]" <u>id.</u> ¶¶ 319-330.

On March 13, 2023, Defendants McKinley County Sheriff's Office and Ronald Silversmith filed a Motion to Dismiss and for Qualified Immunity ("Motion to Dismiss"). ECF No. 41. The remaining Defendants filed an Answer to the Amended Complaint. ECF No. 43.

On August 9, 2023, Deputies Holder, Bennett, and Willie filed a Motion for Partial Judgment on the Pleadings on the Basis of Qualified Immunity. ECF No. 75. The same day, Deputies Holder, Bennett, and Willie filed a Notice of Lodging indicating that they lodged a copy of Deputy Holder's "Lapel Camera Footage with the Court in connection with their Motion for Partial Judgment on the Pleadings on the Basis of Qualified Immunity." ECF No. 76. The Notice

of Lodging further indicates that "[t]he lapel footage will be uploaded to a thumb drive and delivered to the Court Clerk's Office[,]" and that "[a] courtesy copy of the footage will also be sent to chambers." Id. at 1.

On July 17, 2023, the Court issued an Order Granting the Motion to Dismiss. ECF No. 67. Therein, the Court found that Count III of the Amended Complaint does not plausibly allege a supervisory liability claim against Sheriff Silversmith. Id. at 15-18. The Court further found that the McKinley County Sheriff's Office is not a suable entity. Id. at 19-20.

On September 13, 2023, the Court issued an Order denying without prejudice Deputies Holder, Bennett, and Willie's Motion for Partial Judgment on the Pleadings on the Basis of Qualified Immunity. ECF No. 79. Specifically, the Court found that because the Motion was filed before Sheriff Silversmith had filed an Answer to the remaining counts against him, the pleadings had not closed for purposes of Rule 12(c), and therefore the Motion for Judgment on the Pleadings was premature. Id.

Thereafter on September 13, 2023, Sheriff Silversmith filed an Answer to the remaining counts against him in the Amended Complaint. ECF No. 80.

On September 18, 2023, Deputies Holder, Bennett, and Willie (hereafter, "Defendants") filed the instant Motion for Partial Judgment on the Pleadings on the Basis of Qualified Immunity. ECF No. 81. Therein, they argue that they are entitled to qualified immunity as to Counts I, II, IV, and V because those claims fail to plausibly allege a constitutional violation. Id. at 11-20. They further argue that they are entitled to qualified immunity as to Counts IV and V because they do not allege violations of clearly established rights. Id. at 20-21.

## II.     Legal Standards

### A.  Motion for Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  "A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." Atl. Richfield Co. v. Farm Cred. Bank of Wichita, 226 F.3d 1138, 1160 (10th Cir. 2000) (citing Mock v. T.G. & Y Stores Co., 971 F.2d 522, 528 (10th Cir. 1992)).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal if the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This pleading standard does not impose a probability requirement, but it demands "more than a sheer possibility that a defendant has acted unlawfully." Id. Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice.  Twombly, 550 U.S. at 555. Although the court must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor, the plaintiff still "must nudge the claim across the line from conceivable or speculative to plausible." Brooks v. Mentor Worldwide LLC, 985 F.3d 1272, 1281 (10th Cir. 2021).

"Claims dismissed pursuant to a motion under rule 12(c) are dismissed with prejudice." Bhasker v. Kemper Cas. Ins. Co., 361 F. Supp. 3d 1045, 1087 (D.N.M. 2019) (citing In re Great Lakes Dredge & Dock Co., LLC, 624 F.3d 201, 209 (5th Cir. 2010)).

### B.  Qualified immunity

Under 42 U.S.C. § 1983, a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." Estate of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014) (cleaned up).

"A motion to dismiss based on qualified immunity imposes the burden on the plaintiff to show 'both that [1] a constitutional violation occurred and [2] that the constitutional right was clearly established at the time of the alleged violation.'" Doe v. Woodard, 912 F.3d 1278, 1289 (10th Cir. 2019) (quoting Green v. Post, 574 F.3d 1294, 1300 (10th Cir. 2009)).  "A court evaluating qualified immunity is free to 'exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" Id. (quoting Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

A right is clearly established only when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Plumhoff v. Rickard, 572 U.S. 765, 778–79 (2014). "A plaintiff can demonstrate that a constitutional right is clearly established by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir. 2008) (citation and quotation marks omitted); see also District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) ("The rule must be settled law, which

13

means it is dictated by controlling authority or a robust consensus of cases of persuasive authority.") (internal citations and quotation marks omitted).  Although the plaintiff is not required to identify a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate."  Kisela v. Hughes, __ U.S. __, 138 S. Ct.  1148, 1152 (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).  Clearly established law cannot be defined "at a high level of generality"; rather, it must be particularized to the facts of the case.  Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011); see Anderson v. Creighton, 483 U.S. 635, 640 (1987).  But "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Quinn v. Young, 780 F.3d 998, 1005 (10th Cir. 2015) (quoting Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007)).  The dispositive question is whether the unlawfulness of the official's actions was apparent in light of pre-existing law.  Anderson, 483 U.S. at 640.

## III.    Discussion

Defendants argue that they are entitled to qualified immunity as to Counts I, II, IV, and V because those claims fail to plausibly allege a constitutional violation.  Id. at 11-20.  They further argue that they are entitled to qualified immunity as to Counts IV and V because they do not allege violations of clearly established rights.  Id. at 20-21.

Defendants' argument is based, at least in part, on the video footage of the incident that was captured by Deputy Holder's lapel camera.  See id. at 2.  They argue that the recitation of facts contained in the Amended Complaint is

> largely a narration of Deputy Holder's body-worn camera footage. It opens with numerous quotations that could only have come from the video, and goes on to describe in detail events that were captured on the video and could not have come from any other source. Certainly, everything in the video is as central to the claims

14

>   at issue as can be. The video captures the entire incident giving rise to the
>   complaint, from start to finish.

Id. 2-3. They argue that the video evidence "demonstrates that [Defendants] did not act in an

objectively unreasonable manner or a manner that violated clearly established law under the

totality of the circumstances, even when the evidence is viewed in the light most favorable to

Plaintiffs, as it must be at this stage of the proceedings." Id. at 2.  Thus, Defendants appear to urge

the Court to review the video in considering their Motion for Judgment on the Pleadings. See id.

at 2-3.

    In their Response, Plaintiffs argue that the Federal Rules of Civil Procedure do not permit

the Court to review video evidence at this stage in the proceedings.  ECF No. 88 at 2-3.  They

argue that although "parts of the lapel camera video are of some use[,] the video is not central to

the Plaintiffs['] claim and there is a material dispute regarding what is shown on the body worn

cameras[.]"  Id. at 3 (citing Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002)).

They further argue that, in any event, the body camera footage "does not clearly contradict the

allegations in the complaint."  Id.  They further argue that the recitation of facts contained in the

Amended Complaint is not taken solely from the body camera footage.  Id. at 5.  Rather, it "is a

careful analysis of the deputies['] statements given after the fact, the 911 call and dispatch logs;

standard operating procedures of the McKinley County Sheriff's Office, the taser deployment

down-loads obtained by the State Police, along with lapel camera videos various officers were

wearing."  Id.  Finally, they argue that the video "does not capture the entire incident 'from start

to finish' because the lapel camera videos are ordered turned off as the deputies meet at the scene

to coordinate their stories as to what happened."  Id.

In their Reply, Defendants argue that Plaintiffs' characterization of the incident is "belied by the very video evidence Plaintiffs rely upon to construct their narrative, and when the evidence is viewed without those mischaracterizations, it becomes clear that Plaintiffs' federal claims cannot survive."  ECF No. 98 at 2.  They argue that the video "clearly demonstrates that Defendants' actions were not objectively unreasonable under the totality of the circumstances, and it also demonstrates that the cases cited by Plaintiffs as clearly establishing the law are not applicable, because they arose in a context different from what Defendants confronted in this situation."  Id. at 3.  They argue that it is "disingenuous to suggest that the [Amended Complaint] does not rely on the video" in light of the fact that it "opens with a series of dialogue that could only have come from the video, and goes on to describe in detail events that were captured on the video and could not have come from any other source" and "Plaintiffs' Response spends pages discussing events depicted on the video, specifically referring to the video as the source for the allegations."  Id.  As such, Defendants argue that the video is "clearly central to the claims at issue, and the Court may refer to it in this context to the extent that it clearly contradicts allegations in the complaint."  Id. (citing Myers v. Brewer, 773 F. App'x 1032, 1036 (10th Cir. 2019)).

As previously stated, "[a] motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)."  Atl. Richfield Co., 226 F.3d at 1160.  Generally, when reviewing a Rule 12(b)(6) motion, the court cannot consider materials outside the complaint without converting the motion in to one for summary judgment.  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  There are three exceptions to this general rule—specifically, a court may consider: (1) documents attached to or incorporated by reference into the complaint, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); GFF Corp., 130 F.3d at 1384; (2) documents referred to in the complaint if the documents

are central to the plaintiff's claim and the parties do not dispute the documents' authenticity, Jacobsen, 287 F.3d at 941; and (3) matters of which the court may take judicial notice, Tellabs, Inc., 551 U.S. at 322.

Here, the video is not attached to or incorporated by reference into the complaint; it is not referred to in the complaint; and it is not a matter of which the Court may take judicial notice. Consequently, the Court will not review or consider the video evidence at this stage in the proceedings. See Brown v. City of Chicago, 594 F. Supp. 3d 1021, 1030 (N.D. Ill. 2022) (declining to consider body camera footage on Rule 12(b)(6) motion because although the complaint made a "passing reference" to the footage the videos were not "central" to the plaintiffs' claims); Turner v. Garcia-Serna, Civil Action No. 20-cv-00281-CMA-KMT, 2021 WL 1186670, at *4-5 (D. Colo. Mar. 30, 2021) (adopting magistrate judge's finding that consideration of body-worn camera footage submitted in support of the defendants' Rule 12(b)(6) motion was improper even though it was mentioned three times in the complaint because the plaintiff did not rely on the body camera footage to support his claims and were not central to his claims).

The Court now turns to whether Defendants are entitled to qualified immunity as to Counts I and II, before turning to whether Counts IV and V state plausible claims under Section 1983.

**A.  Count I: Unlawful arrest**

Count I alleges that Defendants unlawfully arrested Mr. Carroll in violation of the Fourth and Fourteenth Amendments to the United States Constitution.  ECF No. 40 ¶¶ 235-45.

Defendants argue that they are entitled to qualified immunity as to Count I because (1) the Amended Complaint does not state a plausible claim for unlawful arrest, ECF No. 81 at 17, and (2) Defendants did not violate any clearly established law, id. at 20-21.

### 1. Constitutional violation

First, Defendants argue that Count I fails to satisfy the first prong of the qualified immunity analysis, i.e., that Defendants violated Mr. Carroll's Constitutional right against unlawful seizures. Id. at 17-20.  They argue that Deputy Holder had reasonable suspicion to conduct an investigatory stop based on "the fact that he had received a report of someone matching Mr. Carroll's description acting strangely . . . ."[4]  Id. at 18; see also id. at 19 (citing United States v. Conner, 699 F.3d 1225, 1228 (10th Cir. 2012); United States v. Copening, 506 F.3d 1241 (10th Cir. 2007); United States v. Garner, 416 F.3d 1208 (10th Cir. 2005); United States v. Rideau, 969 F.2d 1572 (5th Cir. 1992)). Defendants further argue that "[o]nce Mr. Carroll fled into the interstate, Defendant Holder had probable cause to arrest him for failure to identify himself and follow basic commands."  Id. at 19 (relying on Oliver v. Woods, 209 F.3d 1179, 1189 (10th Cir. 2000); New Mexico v. Gutierrez, 162 P.3d 156 (N.M. 2007); New Mexico v. Wilson, 169 P.3d 1184 (N.M. Ct. App. 2007)); N.M. Stat. Ann. § 30-22-1 (1963)).  They further argue that Deputy Holder possessed community caretakers powers to detain Mr. Carroll after he fled.  Id. at 20.  They further argue that Deputies Bennett and Willie were allowed to rely on Deputy Holder's determination of reasonable suspicion and probable cause once they arrived on the scene.  Id. (relying on Tooley v. Young, 560 F. App'x 797, 800 (10th Cir. 2014)).

In their Response, Plaintiffs argue that "[t]he existence of probable cause to arrest in a civil rights case as opposed to a criminal case is generally a question for the jury."  ECF No. 88 at 17

---

[4]     Defendants further argue that Defendant Holder had reasonable suspicion to conduct an investigatory because it was "immediately obvious that Mr. Carrol [wa]s walking erratically, gesturing wildly, speaking in a slurred manner, speaking somewhat incoherently, and seemingly unable to comprehend or follow simple directions, raising questions of intoxication and whether a welfare check is needed, especially given the location in which the encounter occurred."  ECF No. 81 at 18.  However, these facts are not contained in the Amended Complaint, and therefore the Court will not consider them at this motion to dismiss stage.

(citing <u>Bruner v. Baker</u>, 506 F.3d 1021, 1028 (10th Cir. 2007); <u>DeLoach v. Bevers</u>, 922 F.2d 618, 623 (10th Cir. 1990); <u>Valez v. Black</u>, 446 F.2d 1071, 1077 (10th Cir. 1971)).  They further argue that Defendants "did not have probable cause to tase Mr. Carroll gratuitously 15 times when he was subdued and not resisting."  <u>Id.</u> at 18.  They further argue that "[a] community caretaker does not have the power to take a non-resisting citizens life by tasing him 15 times face down on the ground."  <u>Id.</u>  They further argue that when Deputy Holder approached, Mr. Carroll was "well away from the roadway[,]" <u>id.</u> (citing ECF No. 40 ¶ 27), "just trying to mind his own business and wanted to leave[,]" <u>id.</u> (citing ECF No. 40 ¶¶ 28-30), "posed no danger to himself Deputy Holder or anyone else present at the rest stop or driving on the interstate[,]" <u>id.</u> (citing ECF No. 40 ¶ 33); and "had not engaged in any criminal conduct[,]" <u>id.</u> (citing ECF No. 40 ¶¶ 39, 47, 51, 54, 56, 58-60, 63, 66).

In their Reply, Defendants focus on the excessive force claim, and do not directly address Plaintiffs' arguments regarding unlawful arrest.  <u>See</u> ECF No. 98 at 3-7.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV.  A "seizure" of one's person occurs when a government actor terminates one's freedom of movement through intentional means.  <u>Brower v. Cnty. of Inyo</u>, 489 U.S. 593, 596-97 (1989).  "[A] person is seized for Fourth Amendment purposes when, considering all the surrounding circumstances, the police conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" <u>United States v. King</u>, 990 F.2d 1552, 1556 (10th Cir. 1993) (quoting <u>Florida v. Bostick</u>, 501 U.S. 429, 439 (1991)).

Two types of seizures are involved in this case: (1) an investigatory stop and (2) an arrest. As to investigatory stops, in Terry v. Ohio, the U.S. Supreme Court held that a police officer can temporarily detain an individual suspected of criminal activity if the officer can point to specific, articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the intrusion.  392 U.S. 1, 21 (1968).  That is, a police officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989).

"To determine whether an investigative detention or a protective search is reasonable under the Fourth Amendment, the inquiry is twofold. First, the officer's action must be 'justified at its inception.'"  King, 990 F.2d at 1557 (quoting Terry, 392 U.S. at 20).  "For an investigative detention, the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity."  Id. (citing Sokolow, 490 U.S. at 7).  Second, the officer's action must be "reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 20.  "An investigative detention may be unreasonable because it is 'a more serious intrusion on [one's] personal liberty than is allowable on mere suspicion of criminal activity.'"  King, 990 F.2d at 1557 (quoting Florida v. Royer, 460 U.S. at 502).

Officers may ask the person questions during the Terry stop to dispel or confirm the officers' suspicions that a law is being violated.  See Royer, 460 U.S. at 498; United States v. Brignoni–Ponce, 422 U.S. 873, 881–82 (1975).  The detainee, however, is not obliged to respond, and "his refusal to listen or answer does not, without more, furnish" reasonable, objective grounds for a detention.  Royer, 460 U.S. at 498.  See also Berkemer v. McCarty, 468 U.S. 420, 439, (1984)

(stating that "the detainee is not obliged to respond.  And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.").

An encounter that goes beyond the limits of a <u>Terry</u> stop is an arrest which must be supported by probable cause or consent to be valid.  <u>See</u> <u>United States v. Perdue</u>, 8 F.3d 1455, 1462 (10th Cir.1993) ("An encounter between police and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause or consent.").

### a.  Initial detention

Here, Deputy Holder reported to the rest area because someone called the police to report that Mr. Carroll was "acting strange."  ECF No. 40 ¶¶ 16, 18.  The strange behavior that Mr. Carroll was allegedly engaging in was entering and exiting his own vehicle, mumbling to himself, and parking his vehicle on the shoulder of the road and away from traffic.  <u>Id.</u> ¶ 17.  When Deputy Holder arrived, Mr. Carroll was walking in a rest area, away from the roadway, was wearing a white tank top and red sweatpants, and was unarmed.  <u>Id.</u> ¶ 20.  Deputy Holder observed that Mr. Carroll was non-aggressive, non-threatening, confused, and disoriented.  <u>Id.</u> ¶ 23.  Mr. Carroll raised his hands in the air and told Deputy Holder he did not want any problems.  <u>Id.</u>  When Deputy Holder approached Mr. Carroll, Mr. Carroll told Deputy Holder that he was trying to leave.  <u>Id.</u> ¶ 24.  Deputy Holder asked Mr. Carroll where he was trying to go, and Mr. Carroll stated that he was trying to go where he "could mind his fucking business."  <u>Id.</u> ¶ 25.  Deputy Holder asked Mr. Carroll if he had been drinking, to which Mr. Carroll replied, "No."  <u>Id.</u> ¶ 26.

Deputy Holder told Mr. Carroll to stay out of the road even though Mr. Carroll was not standing in the roadway, was in the rest area, and posed no threat or danger to his own safety or to the safety of Deputy Holder.  <u>Id.</u> ¶ 28.  Mr. Carroll then repeated to that he is just trying to mind

his own business.  Id. ¶ 29.  Deputy Holder asked Mr. Carroll what was going on with him, and

Mr. Carroll again stated that he just wanted to leave.  Id. ¶ 30.  Deputy Holder then asked Mr.

Carroll to move to another location with him.  Id. ¶ 31. Mr. Carroll then attempted to walk towards

his vehicle, and Deputy Holder said "no, we're not going back over there."  Id. ¶ 32.

 The Court finds that Mr. Carroll was seized at that point because, considering all the

surrounding circumstances, Deputy Holder's conduct would have communicated to a reasonable

person that he was not free to decline the officer's request or otherwise terminate the encounter.

See United States v. Young, 347 F. Supp. 3d 747, 779 (D.N.M. 2018) (finding that an encounter

"stopped being a consensual encounter" and became a Terry stop when the officer took the

detainee's pocketknife and told him to "just hang out tight right here, okay?").

 The Court further finds that the seizure was unreasonable because Deputy Holder lacked

reasonable, articulable suspicion that Mr. Carroll was engaged in wrongdoing that would justify a

Terry stop.  See Royer, 460 U.S. at 498 (stating that when an officer does not have reasonable

suspicion to detain an individual, the individual is not obliged to respond to the officer, and "his

refusal to listen or answer does not, without more, furnish" reasonable, objective grounds for a

detention); United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998) ("Nervousness alone

cannot support reasonable suspicion of criminal activity.").

 The Court rejects Defendants reliance on the "community caretaker" doctrine.

"Encounters are initiated by the police for a wide variety of purposes, some of which are wholly

unrelated to the desire to prosecute for crime."  Terry, 392 U.S. at 13.  "Indeed, police officers are

not only permitted, but expected, to exercise what the Supreme Court has termed 'community

caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence

relating to the violation of a criminal statute.'"  King, 990 F.2d at 1560 (quoting Cady v.

22

Dombrowski, 413 U.S. 433, 441 (1973)).  "In the course of exercising this noninvestigatory

function, a police officer may have occasion to seize a person, as the Supreme Court has defined

the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the

individual, regardless of any suspected criminal activity."  Id. (citations omitted).  "The fact that

the officer may not suspect the individual of criminal activity does not render such a seizure

unreasonable per se as Terry only requires 'specific and articulable facts which . . . reasonably

warrant [an] intrusion' into the individual's liberty."  Id.

> However, a person's Fourth Amendment rights are not eviscerated simply because
> a police officer may be acting in a noninvestigatory capacity for "[i]t is surely
> anomalous to say that the individual . . . [is] fully protected by the Fourth
> Amendment only when the individual is suspected of criminal behavior."  Camara,
> 387 U.S. at 530, 87 S.Ct. at 1731 (footnote omitted).  Whether the seizure of a
> person by a police officer acting in his or her noninvestigatory capacity is
> reasonable depends on whether it is based on specific articulable facts and requires
> a reviewing court to balance the governmental interest in the police officer's
> exercise of his or her "community caretaking function" and the individual's interest
> in being free from arbitrary government interference.  See Brignoni–Ponce, 422
> U.S. at 878, 95 S.Ct. at 2578; Terry, 392 U.S. at 21, 88 S.Ct. at 1880.

Id. at 1560.  "[T]he government's interest must outweigh the individual's interest in being free

from arbitrary governmental interference."  United States v. Garner, 416 F.3d 1208, 1213 (10th

Cir. 2005) (citing King, 990 F.2d at 1560).

Here, Deputy Holder lacked a reasonable, articulable basis to seize Mr. Carroll pursuant to

his community caretaking role.  To begin with, Mr. Carroll was unarmed, and that would have

been readily observable to Deputy Holder in light of the fact that Mr. Carroll was wearing a white

tank top and red sweatpants, ECF No. 40 ¶ 19, and when Deputy Holder approached Mr. Carroll

he "raised his hands in the air[,]" id. ¶ 23.  Moreover, although "a police officer acts properly under

the community-caretaking doctrine by restraining an intoxicated individual or by transporting an

individual to safety[,]" United States v. Chavez, 985 F.3d 1234, 1243 (10th Cir. 2021) (internal

quotation marks and citations omitted), the Amended Complaint alleges that Mr. Carroll told Deputy Holder that he was not intoxicated, ECF No. 40 ¶ 26, and prior to the seizure Mr. Carroll "was well away from the roadway, standing in the rest area, and posed no threat to his own safety or to the safety of [Deputy] Holder[,] id. ¶ 27. Mr. Carroll repeatedly told Deputy Holder that he was "just trying to mind his own business[,]" id. ¶¶ 25, 29, and "he just wanted to leave[,]" id. ¶¶ 24, 30. Accepting these facts as true and drawing all reasonable inferences in Plaintiffs favor, at the time of the initial detention Deputy Holder lacked a specific and articulable basis that reasonably warranted an intrusion into Mr. Carroll's liberty. Alternatively, any interest Deputy Holder may have had in detaining Mr. Carroll did not outweigh Mr. Carroll's interest in being free from arbitrary governmental interference.

Therefore, the Court finds that the Amended Complaint plausibly alleges a claim against Deputy Holder under 42 U.S.C. § 1983 for an unreasonable seizure based on the initial detention.

### b. Arrest

Defendants argue that "[o]nce Mr. Carroll fled into the interstate, [Deputy] Holder had probable cause to arrest him for failure to identify himself and follow basic commands." ECF No. 81 at 19 (citing Oliver, 209 F.3d at 1189). They further argue that Deputy Holder had probable cause to arrest Mr. Carroll for violating N.M. Stat. Ann. § 30-22-1 once he fled from Deputy Holder. Id. at 19-20. The Court rejects both arguments.

In Oliver, an individual ("Mr. Oliver") triggered a silent alarm when he drove into the parking lot of an auto repair shop in order to drop off his car before business hours. 209 F.3d at 1182. A police officer ("Officer Woods") arrived and asked Mr. Oliver for his name and proof of identification, but Mr. Oliver refused to identify himself. Id. Mr. Oliver then told Officer Woods "to step aside because he was leaving[,]" but Office Woods told Mr. Oliver he was not free to

leave.  Id. at 1183.  Mr. Oliver then drove out of the parking lot and was subsequently pulled over and arrested by another officer ("Officer Scow").  Id.  A Justice of the Peace dismissed the case, finding the officers lacked reasonable suspicion that Mr. Oliver violated the law.  Id. at 1184.  Mr. Oliver subsequently brought suit under Section 1983 for a Fourth Amendment violation.  Id.  The district court determined that the officers violated Mr. Oliver's clearly established Fourth Amendment rights and were therefore not entitled to qualified immunity.  Id.  Specifically, the court found "Officer Woods had no reasonable suspicion of criminal activity when he detained Mr. Oliver in the parking lot, and Officer Scow was unreasonable in relying upon the information provided by Officer Woods concerning the original suspicion of criminal activity."  Id.  On appeal, the Tenth Circuit reversed.  Id. at 1191.  Relevant here, it found that Officer Woods had reasonable suspicion to detain Mr. Oliver, and therefore Officer Scow had probable cause to subsequently arrest Mr. Oliver for violating Utah Code Ann. § 76-8-305, which provides, in relevant part:

> A person is guilty of a class B misdemeanor if he has knowledge, or by the exercise of reasonable care should have knowledge, that a peace officer is seeking to effect a lawful arrest or detention of that person or another and interferes with the arrest or detention by:
>
> . . .
> (2) the arrested person's refusal to perform any act required by lawful order:
>     (a) necessary to effect the arrest or detention; and
>     (b) made by a peace officer involved in the arrest or detention; or
> (3) the arrested person's or another person's refusal to refrain from performing any act that would impede the arrest or detention.

Id. at 1188-89.  The Tenth Circuit explained that under this statute, "an individual who merely refuses to refrain from performing any act that would impede the arrest or detention violates this section. Mr. Oliver's actions in the parking lot and on the highway fit the statute's definition of interference with an officer seeking to effect a lawful detention."  Id. at 1189.

> Officer Woods gave a lawful order when he told Mr. Oliver to present identification and to remain in the parking lot while he conducted the investigation. By refusing to present identification, Mr. Oliver refused to perform an act required by lawful order, necessary to effect the detention. By leaving the parking lot, Mr. Oliver performed an act that impeded the detention.

Id. Thus, the Tenth Circuit ultimately found that both officers were entitled to qualified immunity.

Id. at 1190.

The Court finds that Oliver is inapposite because (1) Mr. Carroll was not subject to Utah Code Ann. § 76-8-305, and, in any event, (2) the Tenth Circuit's holding was premised on a finding that Officer Woods had reasonable suspicion to detain Mr. Oliver.  See id.  Here, the Court has found that Deputy Holder lacked reasonable suspicion to detain Mr. Carroll, see Section III(A)(1)(a), supra, and therefore Mr. Carroll was free to terminate the encounter and walk away. Romero v. Story, 672 F.3d 880, 889 (10th Cir. 2012) ("A citizen has the constitutional right to walk away from a law enforcement officer who lacks probable cause or reasonable suspicion to detain or seize him or her.") (citing Kentucky v. King, 563 U.S. 452, 469-70 (2011)).

For the same reason, the Court rejects Defendants' reliance on N.M. Stat. Ann. § 30-22-1. That statute provides, in relevant part: "Resisting, evading or obstructing an officer consists of . . . intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him[.]"  N.M. Stat. § 30-22-1(B).  The Supreme Court of New Mexico has held that this provision applies to an investigatory stop where an officer has reasonable suspicion that the defendant has committed or was about to commit a crime.  New Mexico v. Gutierrez, 162 P.3d 156, 167 (N.M. 2007) ("While a person has the constitutional right to walk away from an officer who lacks reasonable suspicion and simply wants to question the person, a person who walks away from an officer attempting to detain that person based on reasonable

26

suspicion can be charged with evading and eluding an officer under Section 30–22–1(B).").  Here, the Court has already found that Deputy Holder lacked reasonable suspicion to detain Mr. Carroll (when accepting the Amended Complaint's allegations as true and construing them in the light most favorable to Plaintiff).  See Section III(A)(1)(a), supra.  Therefore, he lacked probable cause to arrest Mr. Carroll for resisting, evading, or obstructing an officer in violation of N.M. Stat. § 30-22-1(B); as such, Mr. Carroll was free to terminate the encounter and walk away.  Romero, 672 F.3d at 889 (citing King, 563 U.S. at 469-70).

For these reasons, the Court finds that The Amended Complaint plausibly alleges a claim for unlawful arrest under Section 1983 against Deputy Holder.

However, the Court further finds that Deputies Bennett and Willie are entitled to qualified immunity on the unlawful arrest claim.  "When a warrantless arrest is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d 1185, 1191 (10th Cir. 2007)) (internal quotation marks omitted).  "Qualified immunity also insulates the defendant who reasonably, albeit mistakenly, concludes that there is probable cause."  Id. (citing Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).  "When one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists."  Stearns v. Clarkson, 615 F.3d 1278, 1286 (10th Cir. 2010) (citing Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1260 (10th Cir. 1998)).  "Rather, 'a police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer

may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable.'" Id. (quoting Baptiste, 147 F.3d at 1260).

According to the Amended Complaint, Deputy Holder "radioed that he was in the median, tasing Mr. Carroll but could not get him under control." ECF No. 40 ¶ 99. When Deputy Bennett arrived on the scene, Deputy Holder was on the ground on the shoulder of Interstate 40, struggling to handcuff Mr. Carroll and repeatedly tasing Mr. Carroll. ECF No. 40 ¶¶ 58-138. When Deputy Willie arrived thereafter, Deputies Holder and Bennett were both on the ground on the shoulder of Interstate 40, struggling to handcuff Mr. Carroll, and Deputy Holder was still repeatedly tasing Mr. Carroll. Id. ¶¶ 139-61. Even if Deputy Holder lacked probable cause to believe that Mr. Carroll had committed a crime, it would have been objectively reasonable for Deputies Bennett and Willie to believe that probable cause to arrest Mr. Carroll existed when they arrived on the scene and witnessed Deputy Holder struggle to handcuff Mr. Carroll on the shoulder of Interstate 40. See Boyle v. Torres, 756 F. Supp. 2d 983, 992-93 (N.D. Ill. 2010) (finding that "based on the circumstances they observed when they arrived[,]" officers responding to an officer-in-need-of-assistance call "were entitled to believe" that the arresting officers had probable cause to arrest the suspect, because when they arrived the suspect "was engaged in a scuffle" with the arresting officers, and "[i]t was not necessary for the [responding] officers to make an independent inquiry to establish probable cause") (citing Adeszko v. Degnan, No. 05–C–4589, 2006 WL 3469541, at *4 (N.D. Ill. Nov. 29, 2006) ("[M]erely assisting another officer in effectuating an arrest in progress does not require that the assisting officer acquire probable cause independent of the initiating officer."); O'Leary v. Luongo, 692 F. Supp. 893, 902 (N.D. Ill.1988) ("Probable cause for [Officer] Luongo arose when [Officer] Leide, a reliable informant as a matter of law in the absence of any evidence otherwise, radioed him for assistance."); Perkins v. Daley, No. 87 C 9756,

1989 WL 4213, at *2 (N.D. Ill. Jan. 19, 1989) ("A late-arriving officer may assist in an arrest already in progress when there is no basis for questioning the legality of that arrest.")).

### 2. Clearly established law

In their Response, Plaintiffs wholly fail to address the clearly established law inquiry as it relates to their unlawful arrest claim. Because Plaintiffs failed to satisfy their burden of identifying clearly established law that would have put Deputies Holder, Bennett, and Willie on notice that their conduct would give rise to liability under federal law, the Court finds that Defendants are entitled to qualified immunity as to Count I. Cummings v. Dean, 913 F.3d 1227, 1242 (10th Cir. 2019) (concluding that the plaintiffs "failed to meet the second prong of the qualified-immunity analysis—i.e., Plaintiffs have failed to identify clearly-established law that would have put Director Dean on notice that his conduct would give rise to liability under federal law—and thus we need not reach the first prong of the qualified-immunity analysis, i.e., whether Director Dean's conduct in fact violated Plaintiffs' rights to substantive due process"); A.M. v. Holmes, 830 F.3d 1123, 1134-35 (10th Cir. 2016) ("[I]f the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense.").

### B. Count II: Excessive use of force

Count II alleges that Defendants used excessive force during the incident, in violation of the Fourth and Fourteenth Amendments to the United States Constitution. ECF No. 40 ¶¶ 246-60.

Defendants argue that they are entitled to qualified immunity as to Count II because (1) the Amended Complaint does not state a plausible claim for excessive use of force, ECF No. 81 at 13-17, and (2) Defendants did not violate any clearly established law, id. at 20-21.

### 1.  Constitutional violation

First, Defendants argue that Count II fails to satisfy the first prong of the qualified immunity analysis, i.e., that Defendants violated Mr. Carroll's constitutional right against excessive use of force.  ECF No. 81 at 13-17.

In their Response, Plaintiffs argue that Defendants used excessive force under the circumstances because, at worst, Mr. Carroll had only committed the misdemeanor of crossing a road somewhere other than a cross walk, N.M. Stat. Ann. 66-7-335.  ECF No. 88 at 16. Nevertheless, Deputy Holder tased Mr. Carroll fifteen times "while Mr. Carroll was on the ground not resisting."  Id. at 17.

In their Reply, Defendants argue that "the nature of the crime can change as the incident evolves, much as it did in this situation, where Mr. Carroll attempted to flee and resisted all efforts to bring him under control."  ECF No. 98 at 4.  They further argue that "Mr. Carroll clearly posed a threat to himself, Deputy Holder, and the motoring public when he refused to move off the highway, when he ran across the road, and when he continued to try to move off of the median when Deputy Holder attempted and failed to restrain him."  Id.  They further argue that "the video clearly demonstrates that Mr. Carroll was resisting and attempting to evade arrest by flight[,]" and therefore Defendants actions were reasonable under the circumstances.  Id.

"Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person."  Graham v. Connor, 490 U.S. 386, 394 (1989).  As such, the claim is analyzed under the Fourth Amendment's "reasonableness" standard.  Id. at 395. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth

Amendment requires a careful balancing of ''the nature and quality of the intrusion on the individual's Fourth Amendment interests'' against the countervailing governmental interests at stake.'' Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985) (quoting United States v. Place, 462 U.S. 696, 703 (1983))).

> In determining whether the use of force is reasonable in a particular situation, we consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to flee.[5]

Morris v. Noe, 672 F.3d 1185, 1195 (10th Cir. 2012) (citing Graham, 490 U.S. at 397).

As to the first factor, construing the Amended Complaint's allegations in the light most favorable to Plaintiffs, at the time Deputy Holder began deploying his taser, Mr. Carroll was guilty of—at worst—crossing a road at a point other than a marked crosswalk, which is a "penalty assessment misdemeanor." N.M. Stat. Ann § 66-7-335. The penalty for violating this statute is $25. N.M. Stat. Ann. § 66-8-116(A). Where the crime at issue is a misdemeanor, "the amount of force used should [be] reduced accordingly." Morris, 672 F.3d at 1195 (quoting Fogarty v. Gallegos, 523 F.3d 1147, 1160 (10th Cir. 2012)) (internal quotation marks omitted); Casey v. City of Fed. Heights, 509 F.3d 1278, 1281 (10th Cir. 2007) (holding that when a plaintiff is suspected of committing a minor misdemeanor, this fact "reduces the level of force that was reasonable [for an officer] to use"); Lee v. Tucker, 904 F.3d 1145, 1149 (10th Cir. 2018) (same). However,

---

[5]    When a district court finds that an arrest was unlawful, it "must then analyze the excessive force inquiry under the assumption the arrest was lawful." Mglej v. Gardner, 974 F.3d 1151, 1165 (10th Cir. 2020) (quoting Romero v. Story, 672 F.3d 880, 890 (10th Cir. 2012)).

> [I]n a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Cortez v. McCauley, 478 F.3d 1108, 1126 (10th Cir. 2007) (en banc).

Deputy Holder chased after Mr. Carroll, pushed him to the ground, and, during the ensuing struggle, tased Mr. Carroll eighteen times.  ECF No. 40 ¶¶ 62-157.  This factor weighs in favor of a finding of unreasonable force.

As to the second factor, the Amended Complaint alleges that Mr. Carroll was unarmed and was wearing a white tank top and red sweatpants. ECF No. 40 ¶ 19.  Thus, Deputy Holder would have been able to observe that Mr. Carroll was unarmed.  The Amended Complaint further alleges that even as Mr. Carroll initially ran from Deputy Holder, he kept "his hands above his head even as his pants were falling to the ground." Id. ¶ 48.  When Deputy Holder told Mr. Carroll to "stop right there[,]" Mr. Carroll complied, keeping his hands in the air.  Id. ¶ 49-50.  Although the Amended Complaint alleges that Mr. Carroll "crossed Interstate-40 in an attempt to get away from Defendant Holder[,]" it does not allege that there was any traffic that would pose a hazard to either Mr. Carroll or Defendant Holder.  In the light most favorable to Plaintiffs, Mr. Carroll crossed Interstate 40 safely at a time when no traffic posed a danger to Mr. Carroll, Deputy Holder, or any motorists.  None of the allegations regarding Defendants' ensuing struggle to detain and handcuff Mr. Carroll indicate that Mr. Carroll posed an immediate threat to anyone's safety.  Id. ¶¶ 60-157.  For example, the Amended Complaint does not allege that Mr. Carroll was hitting, kicking, biting, headbutting, spitting on or otherwise attacking Deputy Holder; he was simply trying to get away.  Thus, construing the Amended Complaint's allegations in the light most favorable to Plaintiffs, Mr. Carroll did not pose an immediate threat to the safety of the officers or anyone else.  This factor weighs in favor of a finding of unreasonable force.

As to the third factor, the Amended Complaint reflects that after Mr. Carroll ran across Interstate 40, Defendants struggled to handcuff Mr. Carroll for some time.  See id.  Even when construed in the light most favorable to Plaintiffs, the struggle between Mr. Carroll and Deputy

Holder (and later Deputies Bennett and Willie) suggests that Mr. Carroll was, at times, resisting arrest.  Therefore, the third <u>Graham</u> factor weighs slightly in favor of a finding that Deputy Holder used reasonable force.  <u>But see</u> <u>Emmett</u>, 973 F.3d at 1136 (finding that third <u>Graham</u> factor weighed against the use of significant force where, even though the suspect attempted to flee, the officer "effectively subverted" the flee attempt by tackling him to the ground, and ten seconds later, the officer tased the suspect because he was not complying with commands to "roll over").

However, even accepting that Mr. Carroll was, at times, resisting arrest, which generally justifies "the use of a higher degree of force[,]" <u>Fogarty</u>, 523 F.3d at 1160, the Amended Complaint does not allege a scenario that would justify Mr. Carroll being tased eighteen times. For example, the Amended Complaint alleges that after the second time Deputy Holder tased him, Mr. Carroll "was not moving or resisting and had both hands on the ground above his head, yet Defendant Holder continued to yell for Mr. Carrol[l] to put his hands behind his back."  <u>Id.</u> ¶ 90.  When Mr. Carroll "attempted to sit up," Deputy Holder tased him a third time.  <u>Id.</u> ¶ 91.  In the light most favorable to Plaintiff, attempting to "sit up" does not, without more, justify a taser to the shoulder. <u>See</u> <u>id.</u> When Deputy Holder tased Mr. Carroll for the fourth time, Mr. Carroll was lying on his back with his pants and underwear falling down his legs, and he was not moving and was not resisting.  <u>Id.</u> ¶¶ 93-97.  Deputy Holder tased Mr. Carroll for the fifth time because Mr. Carroll attempted "to sit up" again.  <u>Id.</u> ¶¶ 101-02.

Before Deputy Holder deployed his taser for the sixth time, Mr. Carroll "appeared to be semi-conscious as he laid on the ground" and "repeated the word 'Lord' several times."  <u>Id.</u> ¶¶ 108-11.  Mr. Carroll laid still for approximately 10 seconds after Deputy Holder tased him for the seventh time.  <u>Id.</u> ¶ 119.  Deputy Holder demanded that Mr. Carroll put his hands behind his back, but every time Deputy Holder tased Mr. Carroll he ended up on his back.  <u>See</u> <u>id.</u> ¶¶ 120-24.  After

the eighth time Deputy Holder tased Mr. Carroll, Mr. Carroll moved onto his side so that he could

roll onto his stomach[,]" but Deputy Holder tased Mr. Carroll for the ninth time, causing Mr.

Carroll to again fall onto his back.  Id. ¶¶ 125-26.  "Mr. Carroll eventually rolled onto his stomach,

at which point Defendant Holder again tased Mr. Carroll, this time on Mr. Carroll's back between

his shoulder blades."  Id. ¶ 129.  "The taser was activated so frequently during this period that it

cannot be determined how many times Defendant Holder sent electricity through Mr. Carroll's

body during this tenth tasing."  Id. ¶ 130.  This tenth tasing caused Mr. Carroll to roll over once

again, ending up on his back.  Id. ¶¶ 131-32.  Although Mr. Carroll was not moving, Deputy Holder

tased Mr. Carroll an eleventh time.  Id. ¶¶ 133-34.  At that point, Deputy Holder stood up while

Mr. Carroll laid motionless on his back.  Id. ¶¶ 135-36.  After a few seconds, Deputy Holder

ordered Mr. Carroll to roll over, and he did.  Id. ¶ 137.  Mr. Carroll was laying on his side, not

talking or moving, when Deputy Bennett arrived on the scene, approached Mr. Carroll, and told

Defendant Holder to "tase him again."  Id. ¶¶ 137-38.  Deputy Holder complied, tasing Mr. Carroll

for the twelfth time.  Id. ¶ 140.  Deputy Bennett continued to yell at Mr. Carroll to roll over onto

his stomach, id. ¶ 141; when Mr. Carroll attempted to roll over, Deputy Holder tased him two more

times, id. ¶¶ 141-143.  This time, Mr. Carroll ended up on his stomach with his pants and

underwear at his knees.  Id. ¶ 144.  Deputy Holder tased Mr. Carroll for a fifteenth time by his

shoulder blade, even though Mr. Carroll was complying with Defendants' commands and lying on

his stomach.  Id. ¶¶ 145-47.  This fifteenth tasing caused Mr. Carroll "to moan in pain and roll

over once again, at which point Defendant Holder tased Mr. Carroll on his left arm."  Id. ¶ 148.

While Deputy Bennett was placing the handcuffs on Mr. Carroll, Deputy Holder tased Mr. Carroll

for the seventeenth and eighteenth times.  Id. ¶¶ 150-157.  Deputy Willie then arrived "and pulled

Mr. Carroll's right arm behind his body, causing Mr. Carroll's face to be pressed against the

ground." Id. ¶ 161.  After Mr. Carroll was handcuffed and motionless, "Defendants Holder, Bennett, and Willie continued applying force to Mr. Carroll's back and Mr. Carroll was again told to quit resisting." Id. ¶ 167.  "Mr. Carroll's pants and underwear were at his knees, and his face and mouth were still in the ground." Id. ¶ 169.  At some point, Mr. Carroll stopped breathing and ultimately died. Id. ¶¶ 176-186.

The Court finds that the force used by Deputy Holder was objectively unreasonable under the circumstances because when construing the Amended Complaint's allegations in the light most favorable to Plaintiffs, Deputy Holder had reason to believe that he could have exacted compliance with a lesser amount of force. See Casey, 509 F.3d at 1286 ("[I]t is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance.").  Indeed, the Amended Complaint identifies instances in which Deputy Holder could have exacted compliance with a lesser amount of force, but instead chose to tase Mr. Carroll. See ECF No. 40 ¶ 120 ("Defendant Holder could have grabbed Mr. Carroll's hands or tried to apply handcuffs.  But did not.  Instead, Defendant Holder tased Mr. Carroll again, this time in the shoulder, and caused Mr. Carroll to fall onto his back.").  It also identifies instances in which Mr. Carroll was attempting to comply—or actually complying—but Deputy Holder tased him anyway. See id. ¶ 125 ("Mr. Carroll moved onto his side so that he could roll onto his stomach.  But Defendant Holder again tased Mr. Carroll, causing Mr. Carroll to again fall onto his back."); id. ¶ 147 (alleging that Deputy Holder "had no reason to tase Mr. Carroll" for the fifteenth time "because Mr. Carroll continued to comply with Defendant Holder and Defendant Bennett's commands and was lying on his stomach").  Under these circumstances, tasing Mr. Carroll eighteen times was objectively unreasonable. See Perea v. Baca, 817 F.3d 1198, 1204

(10th Cir. 2016) (finding that tasing suspect ten times within the span of two minutes after suspect was "effectively subdued" was objectively unreasonable).

However, the Court further finds that the force used by Deputies Bennett and was not objectively unreasonable under the totality of the circumstances.  Even in the light most favorable to Plaintiffs, before they arrived on the scene, the only thing Deputies Bennett and Willie knew was that Deputy Holder was tasing someone "but could not get him under control."  ECF No. 40 ¶ 99 ("Defendant Holder pushed Mr. Carroll to the ground, and radioed that he was in the median, tasing Mr. Carroll but could not get him under control.").  When Deputy Bennett arrived on the scene, Deputy Holder tased Mr. Carroll six times before Deputy Bennett "put his knee on Mr. Carroll's hip while applying handcuffs to Mr. Carroll's left wrist."  Id. ¶ 150.  "Defendant Bennett then pushed Mr. Carroll onto his stomach and put his knee on Mr. Carroll's back. This resulted in Defendant Bennett applying the force of his body weight to Mr. Carroll's back while Mr. Carroll was laying on his stomach with his face in the dirt and grass."  Id. ¶ 153.  After Deputy Holder tased Mr. Carroll again, Deputy Bennett "placed a handcuff on Mr. Carroll's left wrist . . . ."  Id. ¶ 156.  Deputy Bennett then placed a new handcuff on Mr. Carroll's right wrist.  Id. ¶ 160.  Deputy Willie then arrived on the scene "and pulled Mr. Carroll's right arm behind his body, causing Mr. Carroll's face to be pressed against the ground."  Id. ¶ 161.  Even when construing these allegations in the light most favorable to Plaintiffs, the force Deputies Bennett and Willie applied to Mr. Carroll was not objectively unreasonable under the totality of the circumstances, and therefore they are entitled to qualified immunity on Count II.  See Lombardo v. Saint Louis City, 361 F. Supp. 3d 882, 896-901 (E.D. Mo. 2019) (finding that the force applied by officers responding to call for assistance in restraining an inmate who ultimately died—possibly of asphyxiation—was objectively reasonable where, when they arrived, they observed "officers struggling to control"

the inmate, and even though he was already handcuffed and shackled, "took control of [the inmate's] arm to prevent him from thrashing about and hitting his head[,]" moved him to a prone position and applied pressure to his "'sides' or torso or back or other parts of his body").

### 2. Clearly established law

Having concluded that Deputy Holder's alleged conduct violated the Fourth Amendment, the Court must address whether, at the time of the incident, it was clearly established that Deputy Holder's conduct constituted excessive force.

Defendants argue that the law was not clearly established at the time of the incident. ECF No. 81 at 20-21.

Plaintiffs argue that the law was clearly established that "use of a taser in certain circumstances has been deemed unreasonable in the Tenth Circuit." ECF No. 88 at 18 (citing Casey, 509 F.3d at 1286 ("[I]t is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance.")). See also id. at 18-19 (citing Emmett v. Armstrong, 973 F.3d 1127, 1137 (10th Cir. 2020); Lee v. Tucker, 904 F.3d 1145 (10th Cir. 2018); Perea, 817 F.3d at 1204; Cavanaugh v. Woods Cross City, 625 F.3d 661, 667 (10th Cir. 2010)).

In their Reply, Defendants attempt to distinguish the cases Plaintiffs rely upon on the grounds that "the video clearly demonstrates that Deputy Holder gave dozens of verbal commands, all of which were ignored, and attempted to use hands-on techniques to bring Mr. Carroll under control, all of which failed." ECF No. 98 at 5. However, as previously discussed, the Court will not review or consider the video evidence at this stage in the proceedings.

"It is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such

conduct is prohibited."  Perea, 817 F.3d at 1204 (citing Mullenix v. Luna, 577 U.S. 7, 11 (2015);

Cavanaugh, 625 F.3d at 666).  "However, the qualified immunity analysis involves more than 'a

scavenger hunt for prior cases with precisely the same facts.'"  Id. (quoting Casey, 509 F.3d at

1284).  "The more obviously egregious the conduct in light of prevailing constitutional principles,

the less specificity is required from prior case law to clearly establish the violation."  id. (quoting

Casey, 509 F.3d at 1284) (internal quotation marks omitted).  "The Supreme Court has cautioned

circuit courts 'not to define clearly established law at a high level of generality,' but to focus on

'whether the violative nature of particular conduct is clearly established.'"  Id. (quoting Mullenix,

577 U.S. at 12).

        Here, on May 18, 2022, it was "clearly established law in the Tenth Circuit that the use of

disproportionate force to arrest an individual who is not suspected of committing a serious crime

and who poses no threat to others constitutes excessive force."  Perea, 814 F.3d at 1204 (citing

Fogarty, 523 F.3d at 1160; Casey, 509 F.3d at 1281, 1285).  "More specifically, it is likewise

clearly established that officers may not continue to use force against a suspect who is effectively

subdued."  Id. (citing, e.g., Fancher v. Barrientos, 723 F.3d 1191, 1201 (10th Cir. 2013); Dixon v.

Richer, 922 F.2d 1456, 1463 (10th Cir. 1991)).  Here, construing the allegations in the Amended

Complaint in the light most favorable to Plaintiffs, Deputy Holder used disproportionate force to

arrest an individual who posed no threat to others and who was, at worst, guilty of a non-arrestable

misdemeanor, see Section III(B)(1), supra, and continued to deploy his taser after effectively

subduing Mr. Carroll.  Consequently, Deputy Holder is not entitled to qualified immunity on Count

II.

### C.  Count IV: Assault and battery

Count IV is titled: "Assault and Battery Resulting in Wrongful Death According to 42 U.S.C. § 1983 Against Defendants Holder, Bennett, and Willie[.]"  ECF No. 40 ¶¶ 275-78.

Defendants argue that assault and battery are state tort claims, not rights arising under the U.S. Constitution, and therefore do not give rise to a Section 1983 claim.  ECF No. 81 at 12-13 (citing Romero v. Bd. of Cnty. Comm'rs of Cnty. of Lake, Colo., 60 F.3d 702, 705 (10th Cir. 1995); Rosales v. Bradshaw, No. CIV 20-0751 JB/JHR, 2021 WL 5356668, at *35 (D.N.M. Nov. 17, 2021); McDade v. City of Chi., 264 F. Supp. 2d 730-, 733 (N.D. Ill. 2003)).  They argue that "[e]ither assault and battery are not actionable under § 1983 or they are components of an excessive force claim; either way they are not a standalone federal civil rights claim."  Id. at 13.

In their Response, Plaintiffs assert that their "assault and battery claims under 1983 are claims for excessive use of force[.]"  ECF No. 88 at 15.

In their Reply, Defendants argue that Plaintiffs' claim for assault and battery under 1983 should be incorporated into their claim for excessive force.  ECF No. 98 at 6-7.

Given Plaintiffs' clarification that Count IV is asserting a claim for excessive use of force, and because Count IV appears to be premised on the same conduct as the excessive force claim asserted in Count II, the Court dismisses Count IV as duplicative of Count II.  See Quezada v. City of Waterbury, Civil No. 3:22-cv-77 (AWT), 2023 WL 5096144, at *5 (D. Conn. Aug. 9, 2023) ("[C]ourts routinely find that a federal assault and battery claim is duplicative of a § 1983 excessive force claim[.]") (quoting Crawley v. City of Syracuse, 5:17-CV-1389, 2018 WL 3716782, at *3 (N.D.N.Y. Aug. 3, 2018)); McDade, 264 F. Supp. 2d at 733 ("As there is no right of action under § 1983 for simple torts such as assault and battery, such allegations may be interpreted as allegations that the defendants used excessive force in apprehending [the defendant].").

### D.  Count V: Familial association

Count V is titled "Survival Action – Violation of Plaintiffs' Chamblee Labell Garces-Wigfall on behalf of her minor children, Coretha Davenport, Beverly Carroll, Ashley Carroll, and Jerry Carroll's Civil Rights to Familial Relationship According to 42 U.S.C. § 1983[.]"  ECF No. 40 ¶¶ 279-80.

Defendants argue that in the Tenth Circuit, "only government action intentionally directed towards familial relations," like interference with parenting decisions, living arrangements, or other familial decision-making, "as opposed to ancillary effects on a familial relationship, will state a plausible claim for interference with a familial relationship."  ECF No. 81 at 11 (citing Cordova v. City of Albuquerque, 816 F.3d 645, 654-55 (10th Cir. 2016), abrogated on other grounds by Thompson v. Clark, __ U.S. __, 142 S. Ct. 1332 (2022); Everhart v. N.M. Child. Youth & Fam. Servs., No. 20-2078, 2022 WL 110835, at *7-8 (10th Cir. 2022); Partridge v. City of Benton, Ark., 929 F.3d 562, 568 (8th Cir. 2019); Murphy v. Bitsoih, 320 F. Supp. 2d 1174, 1185 (D.N.M. 2004)).  They argue that Count V should be dismissed because the "Amended Complaint contains no allegation of the contemplated intent to interfere with anyone's familial relationship." Id. at 12.

In their Response, Plaintiffs argue that "sufficient facts have been plead to establish that there was intent to interfere with the family relationship and an unwarranted and severe intrusion that shocks the conscience."  ECF No. 88 at 14 (citing First Am. Compl. ¶ 280); see also id. at 15 (citing First Am. Compl. ¶¶ 211-34); id. (citing First Am. Compl. ¶¶ 71, 88, 98, 108-09, 150, 152-54, 158-59, 164, 167-68, 177-78, 181).

In their Reply, Defendants argue "Plaintiffs have not pled, nor could they plausibly do so, that any of the defendants knew of Mr. Carroll's relationship with any of the plaintiffs, nor that

they deliberately sought to interfere with those relationships.  They therefore cannot maintain a claim for interference with familial association."  ECF No. 98 at 6.  They submit that if were otherwise, "every excessive force claim on behalf of anyone with a family member would automatically generate a familial association claim."  Id.

The Tenth Circuit has recognized the Constitutional Right to familial association in the context of a Section 1983 claim.  See Cordova, 816 F.3d at 654-55.

> "Th[e] right to familial association is grounded in the Fourteenth Amendment's Due Process Clause."  Lowery v. Cty. of Riley, 522 F.3d 1086, 1092 (10th Cir. 2008).  To prevail on a familial-association claim, a plaintiff must make two showings: (1) that the defendants "intended to deprive [him] of [his] protected relationship," and (2) that balancing the individual's interest in the protected familial relationship against the state's interests in its actions, defendants either "unduly burdened plaintiff['s] protected relationship, or effected an unwarranted intrusion into that relationship."  Thomas v. Kaven, 765 F.3d 1183, 1196 (10th Cir. 2014) (citations and internal quotation marks omitted).  But "not every statement or act that results in an interference with the right of familial association is actionable.  The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship."  Id. (quoting J.B. v. Washington Cty., 127 F.3d 919, 927 (10th Cir. 1997)) (emphasis added).  Put differently, to satisfy the first prong of the test, a plaintiff must allege the defendants had the "intent to interfere" with a particular protected relationship.  Id.; see also Trujillo v. Bd. of Cty. Comm'rs, 768 F.2d 1186, 1190 (10th Cir. 1985).  In conducting the balancing required by the second prong, "the court will consider, among other things, the severity of the infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action."  Thomas, 765 F.3d at 1196.

Id. (footnote omitted).

Here, the Amended Complaint wholly fails to allege—plausibly or otherwise—that Defendants intended to deprive Plaintiffs of their protected relationship.  Consequently, Count V fails to allege that Defendants violated Plaintiffs' Constitutional right to familial association, and Defendants are therefore entitled to qualified immunity as to Count V.  See id. (holding that officers were entitled to qualified immunity on the plaintiff's Section 1983 familial association

claim because at the summary judgment stage the plaintiff failed to raise genuine issue of material fact as to the officers' intent); <u>JGE v. United States</u>, CV 14-710 MV/WPL, 2016 WL 7438011, at *9 (D.N.M. Aug. 9, 2016) (finding that individual defendants were entitled to qualified immunity on Section 1983 familial association claim at the motion to dismiss stage because the complaint failed to allege that the defendants' acts or omissions "'occurred with the specific intent . . . to deprive Plaintiff[s] of [their] rights of association' with [the decedent]") (quoting <u>Bryson v. City of Edmond</u>, 905 F.2d 1386, 1394 (10th Cir. 1990)).

## IV.    Conclusion

Accordingly, it is **HEREBY ORDERED** that:

1.  Defendants Holder, Bennett, and Willie's Motion for Partial Judgment on the Pleadings on the Basis of Qualified Immunity, ECF No. 81, is **GRANTED IN PART AND DENIED IN PART** consistent with this Order;

2.  Counts I, IV, and V of the Amended Complaint are **DISMISSED with prejudice**; and

3.  Count II of the Amended Complaint is **DISMISSED with prejudice** as to Defendants Shane Bennett and Terence Willie.

_____
**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE